White Lick Quar. Meet. of Friends *v.* White Lick Quar. Meet. of Friends.

89  136
129  513
80  136
145  376
145  406
89  136
156  210
89  136
e171  115
171  116

No. 9985

## THE WHITE LICK QUARTERLY MEETING OF FRIENDS, BY HADLEY ET AL., TRUSTEES, *v.* THE WHITE LICK QUARTERLY MEETING OF FRIENDS, BY MENDENHALL ET AL., TRUSTEES.

CHURCHES.—*Courts, Ecclesiastical and Civil.—Jurisdiction.—Religious Society.* —Civil courts in this country have no ecclesiastical jurisdiction. They can not revise or question ordinary acts of church discipline, and can only interfere in church controversies when civil rights, or the rights of property, are involved.

SAME.—*Civil and Ecclesiastical Rights.—Adjudication by Ecclesiastical Tribunal.* —When a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the civil right, and nothing more, taking the ecclesiastical decisions out of which the civil right has arisen as it finds them, and accepting those decisions as matters adjudicated by another jurisdiction.

SAME.—*Determination of Doctrinal Questions.*—The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions, and of all matters which concern the doctrines and discipline of the respective denominations to which they belong.

SAME.—*Ecclesiastical Jurisdiction.*—When a person becomes a member of a church, he becomes so upon the condition of submission to its ecclesiastical jurisdiction, and, however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are involved.

SAME.—*Schism.—Manner of Determining Right to Property of Organization.*— Where a schism occurs in an ecclesiastical organization, which leads to a separation into distinct and conflicting bodies, the respective claims of such bodies to the control of the property belonging to the organization must be determined by the ecclesiastical laws, usages, customs, principles and practices which were accepted and adopted by the organization before the division took place.

SAME.—*Society of Friends.—Organization.—Meetings.—Jurisdiction of.*—The Society of Friends has a regular organization, consisting of a series of religious bodies, holding certain relations to each other, and known as Meetings. The first of these Meetings is the Preparative, organized primarily for worship. The next in grade is the Monthly Meeting, made up of delegates from the Preparative Meetings. The third is the Quarterly Meeting, composed of delegates or representatives from the Monthly Meetings. The fourth is the Yearly Meeting, consisting chiefly of representatives from the Quarterly Meetings, and having a final and con-

trolling jurisdiction in all matters of faith, religious duty, administration and discipline, within its territorial limits.

SAME.—*Separation of Yearly Meeting.*—*Recognition by Civil Courts.*—When a Yearly Meeting separates into two distinct and competing bodies, the body which adheres most closely to the ecclesiastical laws and usages under which such Yearly Meeting was brought into existence, and to the acknowledged organism of the Meeting as it existed before the separation took place, and which is recognized by its co-ordinate Yearly Meetings, will be accepted by the civil courts as the true Yearly Meeting.

SAME.—*Quarterly Meeting.*—*Decision of Yearly Meeting as to Property Rights Binding on Civil Courts.*—When a Quarterly Meeting divides into two separate and conflicting bodies, and one of these bodies, to the exclusion of the other, is recognized by the proper Yearly Meeting as constituting the true Quarterly Meeting, the decision of the Yearly Meeting in that respect, when established as a fact, is binding upon the civil courts as regards questions of property arising out of the division between such separate and conflicting bodies.

SAME.—*Eleemosynary Corporation.*—An eleemosynary charity is, in the general scope of its benevolence, essentially unsectarian, and can only be made sectarian by having such limitations and restrictions placed upon it by the donor as make it so.

SAME.—*Trust and Trustee.*—The mere making of an ecclesiastical organization a trustee for an ordinary eleemosynary charity does not of itself give a sectarian character to the charity.

From the Marion Circuit Court.

*E. F. Ritter, L. Ritter, G. W. Grubbs, B. Harrison, C. C. Hines* and *W. H. H. Miller,* for appellant.

*J. T. Dye, W. P. Fishback, C. H. Test, J. Coburn* and *W. R. Harrison,* for appellee.

NIBLACK, C. J.—On the 29th day of October, 1868, there was, and for many years previously had been, a religious organization in this State, having its place of meeting in Morgan county, known as the White Lick Quarterly Meeting of Friends.

On that day Catharine Mulloy, a resident of the county of Marion, executed and published her last will, two items of which were as follows:

"IV. I will and bequeath to White Lick Quarterly Meeting of Friends five hundred dollars ($500), to be applied at

the discretion of said Quarterly Meeting for suffering humanity, more especially for the benefit of the freedmen and refugees of the South.

"VII. I will and bequeath to White Lick Quarterly Meeting of Friends one thousand dollars ($1,000), to be applied at the discretion of said Quarterly Meeting to the education of poor children."

Catharine Mulloy died in 1869. In 1871 the sums of money named in these items of her will were paid to the White Lick Quarterly Meeting by her executor, and were, by the order of that meeting, placed in the hands of Allen Hadley, its agent and trustee duly appointed to receive and to hold the same.

In 1879 the plaintiff in this suit, claiming to be the White Lick Quarterly Meeting of Friends designated in Catharine Mulloy's will, appointed Benjamin Mendenhall, Evan Hadley and Nathan E. Hubbard trustees to receive and hold the moneys so bequeathed to that meeting, and all other trust funds under the control of said Quarterly Meeting, at the same time ordering Allen Hadley to pay over to such trustees the moneys in his hands derived from the estate of Catharine Mulloy, and held by him as trustee, which he, the said Allen Hadley, afterwards, upon demand, refused to do.

The plaintiff thereupon, acting through, and being represented by, the said Benjamin Mendenhall and his associates as its trustees, commenced this suit in the Morgan Circuit Court against Allen Hadley for the recovery of the moneys which he had refused to pay over as above stated.

Allen Hadley answered that there were two bodies of persons claiming to be the White Lick Quarterly Meeting of Friends and demanding control of the funds in his hands, and asked that these bodies should be required to interplead. It was accordingly so ordered.

The other White Lick Quarterly Meeting of Friends, acting through and represented by the said Allen Hadley and Mahlon Johnson and Thomas Elmore, as its trustees, then appeared to the action and filed a cross complaint, averring

that the White Lick Quarterly Meeting of Friends was set up by the Indiana Yearly Meeting in the year 1831; that in the year 1858 the Indiana Yearly Meeting set up the Western Yearly Meeting at Plainfield, in Hendricks county, to which the White Lick Quarterly Meeting became a subordinate organization; that at the time said Quarterly Meeting was so set up, and long prior thereto, the Society of Friends had accepted and maintained certain fixed and fundamental doctrines and usages, which were set out with much minuteness and detail; that said doctrines and usages were still accepted and maintained when the will of Catharine Mulloy was executed; that said Catharine was attached to, and governed in her religious life by, those fundamental doctrines and usages; that, prior to the death of the said Catharine, certain innovations and departures in faith, doctrine, usages, forms of worship and social habits had been attempted by members of the Society of Friends belonging to the White Lick Quarterly Meeting, and other subordinate organizations within the limits of the Western Yearly Meeting; that said innovations and departures were persisted in after the death of the said Catharine, and on account thereof an actual and complete division of, and separation between, the members of the said White Lick Quarterly Meeting and the organizations subordinate thereto, took place in November, 1877, resulting at that particular time from a division which had occurred in the Western Yearly Meeting during the preceding September, in consequence of the same innovations and departures; that since such division and separation there has been two religious societies known as the White Lick Quarterly Meeting, one of which was the plaintiff and the other the cross complainant; that Allen Hadley was a member of the society constituting the cross complainant, and held the moneys in controversy, subject to the control of that society; that the cross complainant was the only true and lawful organization known as the White Lick Quarterly Meeting; that the plaintiff had obtained and retained the records of the White Lick Quarterly Meeting, and the possession of the meeting-

house belonging thereto, with such a showing of force as rendered it necessary for the cross complainant to ask the interposition of the court in its behalf.

The plaintiff answered the cross complaint, setting forth what purported to be a synoptical description of the organization and internal polity of the Society of Friends, and the relations which its different classes of meetings sustain to each other, and giving a statement as to the manner in which the division of the White Lick Quarterly Meeting was accomplished, and of the action of the Western Yearly Meeting in relation to such division, averring that the persons represented by the cross complainant had separated themselves from the plaintiff without sufficient cause, and that the cross complainant had been set up as a Quarterly Meeting in violation of the established rules and usages of the Society of Friends, and concluding with the further averment that for the reasons given the plaintiff was the White Lick Quarterly Meeting named in the will of Catharine Mulloy.

The cross complainant replied in two paragraphs, the first alleging special matters in avoidance, averring, amongst other things, that the claim of a religious society to belong to the Society of Friends rests upon its faith, doctrines, practices and usages, and not upon the continuity of its organization, and the second making simply a general denial.

Before the issues were completed, the cause was taken by a change of venue to the Marion Circuit Court, where it was tried before the Honorable Ralph Hill, as special judge, without a jury. The finding was for the plaintiff, and after denying a motion for a new trial, a decree was entered in accordance with the finding.

The questions discussed in argument here are only such as arose upon the motion for a new trial.

The evidence is very voluminous, consisting of oral testimony, books, pamphlets and printed matter, all of which have, in some appropriate way, been made a part of the record.

From the evidence we deduce the following facts: The

Society of Friends has a regular organization, consisting of a series of religious bodies, holding certain relations to each other, and known as Meetings. · The first, or lowest of these "Meetings" is the Preparative, organized primarily as meetings for worship, and corresponding in general terms to what are known as congregations in other religious denominations. The next in grade is the Monthly Meeting, made up of delegates from Preparative Meetings. The third is the Quarterly Meeting, composed of delegates or representatives from certain Monthly Meetings. The fourth and highest in authority is the Yearly Meeting, consisting of representatives from all the Quarterly Meetings within certain territorial limits. Each subordinate Meeting is required to report to its immediate superior at stated times. Besides the delegates and representatives, the members of the society generally are entitled to attend all the Meetings and to participate to a greater or less extent in their proceedings. The greater part of the merely disciplinary and administrative business of the society is transacted at the Monthly Meetings, but their proceedings may be reviewed by the Quarterly Meetings and appeals may be still further taken to the Yearly Meetings. Each Yearly Meeting has a final and controlling jurisdiction in all matters of faith, religious duty, administration and discipline within its territorial limits, and is regarded as a co-ordinate supreme judicatory with other Yearly Meetings, all constituting the ecclesiastical system known as the Society of Friends.

This general plan of organization is adhered to by all classes of English-speaking people claiming to be Friends, but more generally known as Quakers. Instead of general conventions, general conferences, or other general assemblages of some kind, as is provided for in most other religious organizations, the Society of Friends has adopted a system of correspondence and fraternal communication, between its Yearly Meetings in unity and general accord, with each other, which is carried on by means of epistles, liberating certificates, visits, interchanges of ministers and general letters of recommendation. ·

By this system of intercommunication each Yearly Meeting receives information from time to time as to the general condition of all the other Yearly Meetings with which it is in correspondence, and is afforded an opportunity of consulting such other Yearly Meetings in all affairs of serious difficulty or of grave importance.

In matters of correspondence, and of an advisory character merely, the Yearly Meeting of England, which assembles at London, and which was organized and established more than two hundred years ago, has usually had accorded to it that kind of precedence which is quite frequently, if not usually, conceded to the oldest member of a family, and correspondence with, and consequent recognition by, that Yearly Meeting has been regarded by most, if not all, the Yearly Meetings on this continent, as a matter of considerable, if not of very great, importance. But the extent to which this precedence has been accorded to the London Yearly Meeting, and the importance of recognition by that Yearly Meeting, are matters of some controversy in this action.

The fact, however, that a Yearly Meeting maintains correspondence with the London Yearly Meeting, and with such other Yearly Meetings as it holds fraternal relations with, affords a circumstance strongly tending to establish regularity in the organization and continued existence of such Yearly Meeting. Until within a comparatively recent period the fact that a Yearly Meeting maintained such a correspondence was accepted by all persons claiming to be Quakers as sufficient evidence of its regular standing as an organization belonging to the Society of Friends.

In the peculiar phraseology of the Society of Friends, a meeting is said to have been " set up," when it has been organized according to the usages of the society, and to have been " laid down," when it has been formally dissolved.

A new Yearly Meeting is set up by some contiguous or convenient Yearly Meeting, but only with the consent of all the

Yearly Meetings with which such contiguous or convenient Yearly Meeting is in unity and fellowship.

When a new Yearly Meeting is set up, it acquires jurisdiction over all subordinate meetings already established within its territory. Quarterly Meetings are set up by the proper Yearly Meeting; Monthly Meetings are set up by the Quarterly Meetings, and the Preparative Meetings are set up by the Monthly Meetings.

The clerk of the Meeting is, in a qualified but, nevertheless, in a general sense, its presiding officer, as well as the recorder of its proceedings, and during his term in office he stands at the head of the organization which constitutes the Meeting. The Meeting itself is frequently contradistinguished from others by a reference to him as its clerk. When, therefore, a clerk has been regularly appointed the Meeting is fully organized and ready to proceed with its business.

The manner of transacting business at the Meetings of Friends is peculiar to the people who compose those Meetings. Unanimity is sought in every reasonable way. Unless the emergencies of business absolutely require a different course of proceeding, immediate action is not demanded upon any proposition to which there is serious opposition. The results of their deliberations are not determined by a majority vote, or any other proportionate number of members. No division of members is ever called for or vote ever taken. No protest is suffered to be entered, and silence is construed as giving consent. The members look and wait for an union of minds, and endeavor to reach a conclusion by a courteous yielding up of opinions in deference to those most competent to judge of the measure proposed, or by an acquiescence in what appears to be the prevailing sentiment amongst those who are present. If entire unity is not made manifest the clerk proceeds to collect what appears to him to be the "solid sense" of the Meeting.

In thus gathering the sense of the Meeting the clerk takes into consideration the number, age, intelligence, experience,

piety and other distinguishing traits of those uniting with, and of those opposing, the measure, acting upon the theory that the spirit of divine truth is assisting him in his work.   He then makes a minute of the sense of the members present, as he has gathered it, and reads it to the Meeting.   If the minute so made is acquiesced in to the extent that practical unanimity is secured, it is recorded as the action of the Meeting; but if it is not so acquiesced in the measure is either modified, postponed, withdrawn or dismissed entirely.

In 1831 the White Lick Quarterly Meeting was set up by the Indiana Yearly Meeting, whose place of meeting then was and still is in the city of Richmond, in this State, and of whose territory Morgan county then formed a part.

In 1858, the Western Yearly Meeting was also set up with its place of meeting at Plainfield, in Hendricks county, by the Indiana Yearly Meeting, with the consent and acquiescence of the London, Dublin, New England, New York, Baltimore, North Carolina and Ohio Yearly Meetings, with all of which it was at the time in correspondence, and, after being so set up, the Western Yearly Meeting entered into a correspondence and fraternal relations with all of these Yearly Meetings which had participated as above in the work of setting it up.   When the Western Yearly Meeting was brought into existence, the White Lick Quarterly Meeting fell within the territory assigned to it and became one of its subordinate organizations.   After the Western Yearly Meeting was set up, Yearly Meetings were also set up in Iowa, Kansas and Canada, with the consent of that Meeting and the other Yearly Meetings which had taken part in its formal organization. The relations between all the Yearly Meetings above enumerated continued as they had begun until the meeting of the Western Yearly Meeting on the 14th day of September, 1877, at which time that Yearly Meeting was composed of 14 Quarterly Meetings, with a church membership of between 12,000 and 14,000 persons.   The White Lick Quarterly

Meeting was one, and the Plainfield Quarterly Meeting constituted another of these 14 Quarterly Meetings.

At its session of 1865, the Western Yearly Meeting revised and adopted a discipline for the Society of Friends within its jurisdiction which was published in book form during the ensuing year.   That discipline, which was in force during the year 1877, contained a provision which remains in force, that the representatives from the Quarterly Meetings to the Yearly Meeting are annually to choose a clerk and an assistant or assistants, at the close of the first day's sitting of the Yearly Meeting for discipline, whose names are to be reported at the opening of the next sitting.

During the summer of 1877 some difficulty and disorganization occurred at a meeting of the Plainfield Quarterly Meeting, which resulted in sending two reports and two sets of representatives to the Yearly Meeting, both reports purporting to be from that Quarterly Meeting.   One of these reports was signed by Oliver Albertson as clerk, and the other was signed by Albert Maxwell in the same capacity.

When the Western Yearly Meeting came together on the 14th day of September, 1877, it met at a meeting-house in Plainfield, at which it had theretofore been accustomed to assemble.   During its first day's sitting the two reports from the Plainfield Quarterly Meeting were referred to the representatives of all the other Quarterly Meetings for examination and report.

At the close of that day's sitting the representatives of all the Quarterly Meetings, except the Plainfield, assembled and chose a clerk and two assistants, whose names are hereafter given, also considered the two reports from the Plainfield Quarterly Meeting, and agreed to the recommendation they should make concerning those reports as it was afterwards reported to the Yearly Meeting.

When the Yearly Meeting assembled next morning Aquilla H. Pickering, on behalf of the representatives, proposed Bar-

nabas C. Hobbs for clerk and Elwood C. Siler and John A. Taylor for assistants. These persons were approved, and appointed to serve, as proposed, for the ensuing year. The representatives then reported that the report purporting to come from the Plainfield Quarterly Meeting, and signed by Oliver Albertson, was the correct and official report from that Quarterly Meeting. , This report was concurred in by the Yearly Meeting, and the names of the representatives contained in the report signed by Oliver Albertson were directed to be placed in their proper order on the list, with the representatives from the other Quarterly Meetings. After these proceedings were taken, one of the members in attendance, who had united with the quarterly report signed by Albert Maxwell, stated in substance to the Meeting, that as the friends of that report had been rejected he proposed that Friends feeling aggrieved should withdraw from the Meeting to some other place to transact the business for which the Western Yearly Meeting had convened.

Another member, also in attendance, seconded this proposition by announcing that for the purpose of maintaining the doctrines of the Society, and of transacting the business of the Meeting, according to the order and usages of Friends, all persons wishing to do so were invited to retire from the Meeting then in session.

A considerable number of persons, all members of the Society of Friends, thereupon withdrew to a school-house near by, and organized a Yearly Meeting, to be known as the Western Yearly Meeting, and proceeded to transact the business of a Yearly Meeting, upon the assumption that the Meeting so organized constituted the original, genuine and regularly established Western Yearly Meeting. Out of between 60 and 70 representatives who had been admitted to seats in the Yearly Meeting which had assembled at the meeting-house only two participated or assisted in the organization of the Yearly Meeting at the school-house. One of these was from the Plainfield, and the other from the Union, Quarterly

Meeting.   The Yearly Meeting thus organized at the school-house has since continued to meet regularly at Sugar Grove, a place about two miles south of Plainfield, under the name of the Western Yearly Meeting, and for convenience of identification may be called the Sugar Grove Yearly Meeting.

The Yearly Meeting which had met at the meeting-house, and which, for convenience, may be designated as the Plainfield Yearly Meeting, continued in session after the separation, retaining the minutes and all other records and papers pertaining or belonging to the Western Yearly Meeting, and, without making any note of the withdrawal of a part of its members, apparently transacted all business which had come, or afterwards came, before it, after which it closed in the usual form, to meet the following year.

In 1878 the same body, that is to say, a Yearly Meeting represented by the same officers and composed of representatives purporting to be from the same Quarterly Meetings, and acting in general conformity with the discipline which had been adopted for the government of the Western Yearly Meeting in 1865, as herein above stated, assembled at the same meeting-house in Plainfield, on the day provided in that discipline, and under the name of the Western Yearly Meeting, proceeded to transact the current business of the year, ostensibly within the jurisdiction of that Meeting.

Since then, the same ecclesiastical organization, claiming to be the true and only Western Yearly Meeting, has, in the same manner, met regularly and annually at Plainfield, and has continued in correspondence, and in unity and fellowship, with the same Yearly Meetings with which the Western Yearly Meeting was in correspondence, and in unity and fellowship, before the separation in 1877.   Soon after these two contesting Yearly Meetings closed their sessions in 1877, each sent a copy of its minutes to the White Lick Quarterly Meeting, as both doubtless did to other Quarterly Meetings, and when that body met in November, 1877, at the town of Mooresville, in Morgan county, its regular place of meeting,

its clerk informed the Meeting that minutes of two bodies, each claiming to be the Western Yearly Meeting, had been placed in his hands and were upon its table for its consideration, and suggested that as the White Lick Quarterly Meeting had only been represented in the Yearly Meeting which had met and continued its session at the meeting-house at Plainfield, he thought the proper course would be to accept and give preference to the minutes of that Yearly Meeting. That suggestion was approved by the White Lick Quarterly Meeting, and it was ordered that the last named minutes be received and adopted as the official minutes of the Western Yearly Meeting. Before proceeding to any other business, the clerk was requested to wait a few moments that those feeling dissatisfied with the action which the Meeting had just taken might have an opportunity of being heard. A statement was then made of the objections which existed in the minds of many members to the reception and adoption of the minutes of the Plainfield Yearly Meeting, basing these objections upon the alleged ground that that Yearly Meeting had tolerated and permitted many innovations upon the doctrines and practices of the Society of Friends, in opposition to the views of a large class of members, who believed in a strict adherence to those doctrines and practices, and who had the right to insist upon a strict adherence to them. The announcement was then made that many persons present felt it to be their duty to withdraw from the Meeting, and, accordingly, 20 or 25 members did withdraw, leaving the clerk and 200 or more persons with the records and minutes of the White Lick Quarterly Meeting in possession of the meeting-house, who continued in session as a Quarterly Meeting, without the slightest show of force, either then or at any time afterwards. These withdrawing members assembled in the meeting-house yard and initiated measures for the organization of a Quarterly Meeting, to be known as the White Lick Quarterly Meeting, first appointing a clerk to act for the occasion. They then adjourned over for a few days, to meet at West Union,

a meeting-house near Monrovia, in Morgan county.   At the time appointed these withdrawing members assembled at West Union and proceeded to complete their organization as a Quarterly Meeting.   The Quarterly Meeting thus organized has ever since met regularly, either at West Union or at a place called Beech Grove, under the name of the White Lick Quarterly Meeting, and transacted such business as usually comes before a Quarterly Meeting, acting upon the avowed claim that it constitutes the true and lawfully established White Lick Quarterly Meeting, simply reorganized in the interest of orthodox religion, and for the preservation and perpetuation of the ancient faith, doctrine and practice of the Society of Friends, and it is that Quarterly Meeting which appears as the cross complainant in this action.

After the organization of that Quarterly Meeting Allen Hadley united with it, and has continued to be a member of it, acknowledging and asserting it to be the White Lick Quarterly Meeting mentioned in Catharine Mulloy's will.

In 1878 this Quarterly Meeting sent representatives to the Sugar Grove Yearly Meeting, and has ever since been recognized as a component part, and as within the ecclesiastical jurisdiction of that Yearly Meeting, still continuing to send representatives regularly to its annual Meetings.

The Quarterly Meeting which continued in session at the White Lick meeting-house after the withdrawal of a part of the members, who met with those remaining as herein stated, and which is the plaintiff in this suit, has since held regular meetings at the same meeting-house, retaining the name of the White Lick Quarterly Meeting, and discharging all the functions of a Quarterly Meeting. It has sent representatives regularly to the Plainfield Yearly Meeting since the separation, and has been dealt with and treated by that Yearly Meeting as one of its subordinate organizations, and as the White Lick Quarterly Meeting which was in existence and fully represented in the Western Yearly Meeting when it assembled in September, 1877, prior to the separation.

At the time of the separation between its members, the White Lick Quarterly Meeting was composed of two Monthly Meetings—the White Lick and the West Union. The White Lick Quarterly Meeting, now appearing as plaintiff, is made up of two Monthly Meetings of the same names, and purporting to be the same Monthly Meetings. The cross complainant, White Lick Quarterly Meeting, has, ever since soon after its organization, been composed of two Monthly Meetings known as West Union and Beech Grove.

Those known by the general name of Friends, and residing upon the American continent, are divided into three principal groups of Yearly Meetings. The first of these groups comprises all of the Yearly Meetings which are in correspondence and in regular fraternal relations with the London Yearly Meeting, and to which we have already referred. Of this group the New England, formerly known as the Rhode Island, Yearly Meeting is the oldest American Yearly Meeting. The second embraces those Yearly Meetings which have their origin in a division of the Society of Friends, commencing in the year 1827, in which Elias Hicks, a minister of the Society, bore a prominent part. Those constituting these Meetings are known in common parlance by the distinguishing name of Hicksite Quakers. The third is composed of a class of Yearly Meetings which, in the matter of their immediate organizations, are of a still more recent date. Those uniting with this class of Yearly Meetings, as between themselves and others claiming to be Quakers, prefer to be known as Orthodox Friends.

These Yearly Meetings base their claims to regularity in their organizations upon their avowed adherence to the ancient principles of Quakerism, and upon the orthodoxy of their sentiments as Quakers on the general subject of religion. It is to this group that the Sugar Grove Yearly Meeting belongs, and with which it is in correspondence and in unity. It has never been in correspondence, or in regularly recognized fra-

ternal relations, with any of the Yearly Meetings constituting the first group.

The position of the Philadelphia Yearly Meeting is somewhat anomalous. It is next to the oldest, and, in some respects, has been, and perhaps continues to be, one of the most influential Yearly Meetings on this continent, and on terms of courtesy and friendship with many other Yearly Meetings; yet, owing to some internal difficulties and disagreements as to what relations it ought to sustain to certain other bodies claiming to be Yearly Meetings, it has ceased to have regular correspondence with any other Yearly Meeting. We, consequently, find it difficult, if not impracticable, to classify it with any one of the groups of Yearly Meetings to which we have referred.

With these facts before us, the question for decision is, which of the two ecclesiastical bodies bearing the name of the White Lick Quarterly Meeting constitutes the Quarterly Meeting to which Catharine Mulloy made her bequests?

Civil courts in this country have no ecclesiastical jurisdiction. They can not revise or question ordinary acts of church discipline, and can only interfere in church controversies where civil rights or the rights of property are involved. Where a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the civil right, and nothing more, taking the ecclesiastical decisions, out of which the the civil right has arisen, as it finds them, and accepting those decisions as matters adjudicated by another jurisdiction. The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions, and of all matters which concern the doctrines and discipline of the respective religious denominations to which they belong. When a person becomes a member of a church he becomes so upon the condition of submission to its ecclesiastical jurisdiction, and however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are invaded.

This doctrine inevitably results from that total separation between church and state which exists within the limits of the United States, and is essential to the full enjoyment of the guaranteed rights of American citizenship. Very naturally a different rule prevails in England, where church and state are united.

In commenting upon the powers and duties of the civil courts in cases arising out of church controversies, the Supreme Court of the United States, in the case of *Watson* v. *Jones*, 13 Wal. 679, on p. 727, says:

" In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority, is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." And, again, on p. 727 : " It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

In *Harrison* v. *Hoyle*, 24 Ohio St. 254, which was a case growing out of a division in the Society of Friends, and very closely resembling the present case in its leading features, the court closes a very elaborate opinion with the following statement of principles : " Civil courts, in determining the question of legitimate succession, in cases where a separation has taken place in a voluntary religious society, will adopt its rules, and will enforce its polity in the spirit and to the effect for which it was designed. When public policy, or the positive law of the land, is not contravened, the decisions and orders of the society, when made in conformity to its polity, should have the

same effect, upon the subject to which they relate, in civil courts, which the society intended should be awarded to them when pronounced by its own judicatories. If such society be composed of separate bodies, whether co-ordinate or subordinated, the rules of the society for the management of its internal affairs, and for the adjustment of the relations between its branches, constitute the law by which they should be governed."

In *Chase* v. *Cheney*, 58 Ill. 509, the court, in summing up the case, says: "A rector in the church is charged with non-conformity to its doctrines; intentional omissions in the ministration of its ordinances; and the attempt is made to organize a court, composed of his brother clergymen, for his trial. He appeals to the civil court, and alleges as the chief reason for interposition, the want of authority in the spiritual court to try him, and a misconstruction of the canons. * It was urged, with the same earnestness, and enforced with the same arguments there as here. The court overruled the objection, and decided that it had jurisdiction. Five intelligent clergymen of the church, presumed to be deeply versed in biblical and canonical lore, were more competent than this court to decide the peculiar questions raised. Why should we review that, and not every other decision which involves the interpretation of the canons? It is conceded that when jurisdiction attaches, the judgment of the church court is conclusive, as to purely ecclesiastical offences. It should be equally conclusive upon doubtful and technical questions, involving a criticism of the canons, even though they might comprise jurisdictional facts."

In *Baptist Church* v. *Witherell*, 3 Paige, 296, WALWORTH, Chancellor, says: "All questions relating to the faith and practice of the church and its members belong to the church judicatories, to which they have voluntarily subjected themselves."

In *Lawyer* v. *Cipperly*, 7 Paige, 281, the same learned jurist says: "The church, or spiritual body, as to its doctrine, government and worship, is to be governed and regulated by its own peculiar rules."

In *Miller* v. *Gable*, 2 Denio, 492, it is said by GARDINER, President: "It must be a plain and palpable abuse of trust which will induce a court of equity to interfere, respecting a controversy growing out of a difference in religious and sectarian tenets."

In *Watkins* v. *Wilcox*, 66 N. Y. 654, the language above copied from *Miller* v. *Gable* is quoted with approbation.

In *Bowden* v. *McLeod*, 1 Edwards Ch. 588, the Vice Chancellor, in speaking of the jurisdiction of the civil court over churches, says: "It has nothing, immediately, to do with their spiritual concerns, church government, discipline, faith, doctrines or modes of worship. These are matters which are to be left to the regulation of their own peculiar tribunals and the ecclesiastical judicatories of each church."

In the case of *Smith* v. *Nelson*, 18 Vt. 511, where a legacy was left to the Associate Congregation of Ryegate, the interest whereof was to be annually paid to their minister forever, it was held that though the Ryegate congregation was one of a number of Presbyterian churches connected with the general body of the Presbyterian church, the only enquiry was whether the society still existed, and whether they had a minister chosen and appointed by the majority and regularly ordained over the society, agreeably to the usage of that denomination. In the course of his opinion in that case the Chief Justice says: "This court, having no ecclesiastical jurisdiction, can not revise or question ordinary acts of church discipline. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. We can not decide who ought to be members of the church, nor whether the excommunicated have been, justly or unjustly, regularly or irregularly, cut off from the body of the church."

In the case of *German Reformed Church* v. *Seibert*, 3 Pa. St. 282, the Supreme Court of Pennsylvania concludes by saying: "The decisions of ecclesiastical courts, like every other judicial tribunal, are final; as they are the best judges of what

constitutes an offence against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals."

The case of *Harmon* v. *Dreher*, 1 Speers Eq. 87, turned upon certain rights in the use of the church property claimed by Dreher, the minister, notwithstanding his expulsion from the Synod of the church as one of its members. "He stands, therefore," said the Chancellor, "convicted of the offences alleged against him, by the sentence of the spiritual body, of which he was a voluntary member, and whose proceedings he had bound himself to abide. It belongs not to the civil power to enter into or review the proceedings of a spiritual court. The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of the civil authority. The judgments, therefore, of religious associations, bearing upon their own members, are not examinable here; and I am not to enquire whether the doctrines attributed to Mr. Dreher, were held by him, or whether, if held, they were anti-Lutheran; or whether his conduct was, or was not, in accordance with the duty he owed to the Synod, or to his denominations." Page 120.

Where a schism occurs in an ecclesiastical organization which leads to a separation into distinct and conflicting bodies, the respective claims of such bodies to the use of the property belonging to the organization must be determined by the principles which underlie the control of voluntary associations. If there be within the organization officers or duly appointed persons in whom the powers of such control are vested, those who adhere to the acknowledged organism by which the organization is governed are entitled to the use of

156     SUPREME COURT OF INDIANA,

White Lick Quar. Meet. of Friends v. White Lick Quar. Meet. of Friends.

the property without reference to whether they constitute a majority of members. The title to the property of a divided church is in that part of the organization which is acting in harmony with its own law; and the ecclesiastical laws, usages, customs, principles and practices, which were accepted and adopted by the church before the division took place, constitute the standard for determining which of the contesting parties is in the right. *Watson* v. *Jones, supra; McGinnis* v. *Watson,* 41 Pa. St. 9; *Winebrenner* v. *Colder,* 43 Pa. St. 244; *Schnorr's Appeal,* 67 Pa. St. 138 (5 Am. R. 415); *Roshi's Appeal,* 69 Pa. St. 462 (8 Am. R. 275).

An eleemosynary charity, like those provided in the will of Catharine Mulloy, is essentially unsectarian in the general scope of its benevolence, and such a charity can only become sectarian by having such limitations and restrictions placed upon it by the donor as make it so.

The making of an ecclesiastical society a trustee merely for an ordinary eleemosynary charity does not of itself give a sectarian character to the charity, and if no limitations or restrictions are imposed to the contrary, the ecclesiastical body may continue in possession of the charity as its trustee so long as it continues to be essentially and characteristically the same organization, without reference to changes or modifications which it may make in matters of mere detail, or of relatively subordinate importance, connected with its faith, doctrine and practices. *Attorney General* v. *Moore,* 19 N. J. Eq. 503; *Watkins* v. *Wilcox, supra.*

Where a charity is, by a proper instrument in writing, devoted to the propagation, support or sustenance of certain definite religious doctrines or principles, the civil courts will see to it that the property or money so dedicated is not diverted from the purposes for which it is set apart. In such a case it is the use to which the property or money is or has been applied, and not the faith, doctrines or religious practices of the trustee, which is the subject of enquiry.

In this general class of cases it is only where certain

specific doctrines, views or religious practices have become a distinguishing characteristic in the identification of the trustee that his or its peculiar doctrines, views or religious practices, can be made a proper matter of judicial investigation.

When the Western Yearly Meeting met in 1877, it assembled, as already stated, at the time and place prescribed in its book of discipline, which, for all practical purposes, was its written constitution. At that time its regular standing as a Yearly Meeting of the Society of Friends stood unchallenged, save by a class of religionists whom its members regarded as separatists and schismatics. The laws of its creation and continued existence were based upon the theory that it was one of a group of Yearly Meetings, forming a body which constituted the true Society of Friends, and whose regularity of organization had been recognized in principle by the noted cases of *Earle* v. *Wood,* 8 Cush. 430; *Hendrickson* v. *Decow,* 1 Saxton, 577; *Harrison* v. *Hoyle,* 24 Ohio St. 254; and, perhaps, other less important cases.

The members of that Yearly Meeting were, impliedly at least, committed to the correctness of the theory upon which the laws of its creation and existence were thus based. That Meeting proceeded regularly to business, and, at the times indicated for those purposes in its discipline, first nominated and then appointed a clerk and his two assistants, thus fully reorganizing the body as a Yearly Meeting for the ensuing year. The action which it took in regard to the contesting delegations from the Plainfield Quarterly Meeting was in accordance with the usages of the society, and with the inherent powers of all unrestricted representative bodies, amenable only to parliamentary law. Whether, therefore, abstractly right or abstractly wrong, its action in respect to those conflicting delegations was neither revolutionary nor irregular, and worked no innovation or departure either in discipline or in parliamentary usages when seats in the constituent body are contested.

No objection appears to have been made to any specific proceeding of the Meeting upon the ground that it was an

innovation upon the ancient doctrines or usages of the Society, and nothing has been shown by the evidence of which complaint is specifically made of the Yearly Meeting in that respect. The charge, therefore, that the Yearly Meeting had improperly tolerated innovations and departures in matters of faith or of doctrine, or in the methods ·of conducting religious worship, is not sustained by the evidence.

The withdrawal of a part of the members, when the report signed by Albert Maxwell was rejected, presents what appears to us to have been a case of persons who had become dissatisfied with their religious associations and surroundings, and who had resolved to seek new affiliations and, if possible, a more congenial religious atmosphere, regardless of any question of regularity in the manner of their withdrawal. These members had the lawful right to withdraw as they did, and, for aught we know to the contrary, they had also the moral right to do so. It ·may be that as a result of their withdrawal they have been enabled to form better religious associations, and that thereby their chances of securing divine favor have been greatly enhanced. These are matters concerning which we are not permitted to judge, and about which, in any event, we feel ourselves to be incompetent to express an authoritative opinion. We, as judges of a merely civil court, have not been trained for, and are hence very properly not chargeable with, the decision of such questions. The inevitable conclusion, however, seems to us to be that when these dissatisfied members withdrew and entered a new, independently organized and conflicting religious body, they did so in violation of the usages, customs, traditions and discipline of the Western Yearly Meeting to which they had theretofore adhered, and that they by that means severed their connection with that Yearly Meeting, since distinguishably known as the Plainfield Yearly Meeting.

Applying the law as we have stated it to the facts as we have deduced them from the evidence, the conclusion appears to us to be equally inevitable that the Plainfield Yearly Meet-

ing constitutes the continuous and true Western Yearly Meeting set up and established at Plainfield in 1858.

As must have been observed, the charities in controversy in this case have no sectarian limitations or restrictions placed upon them. The White Lick Quarterly Meeting is made a trustee for charitable, and not distinctly religious, purposes. The real questions at issue are, consequently, those of organization and identity, and not of doctrine or particular methods of worship.

The general principles we have applied to the separation which occurred in the Yearly Meeting are alike applicable to the separation which afterwards took place in the White Lick Quarterly Meeting.

If the Quarterly Meeting organized by the withdrawing members had applied to the true Western Yearly Meeting for recognition and had been admitted to representation in that Meeting as the regular White Lick Quarterly Meeting, a very different question from anything now before us would have been presented.

Instead, however, of so applying to the true Yearly Meeting, the new organization sought and obtained admission as a member of the Sugar Grove Yearly Meeting, which, for the reasons given, must be regarded as an irregularly organized Yearly Meeting, and as belonging to a group of Yearly Meetings with which the true Western Yearly Meeting has never been in unity and fellowship. In many essential respects, therefore, the new organization, in its relations to the Society of Friends, occupies positions quite different from those sustained by the White Lick Quarterly Meeting prior to and at the time of the separation.

Up to and at the time of the assembling of the White Lick Quarterly Meeting, in November, 1877, it had been, and still was, in undisputed subordination to, and in fraternal relations with, what we have designated as the Plainfield Yearly Meeting. It could not, therefore, have consistently done otherwise than accept the minutes of that Yearly Meeting as the official minutes of the Western Yearly Meeting.

Those who remained in the meeting-house after the withdrawing members left it, and adhered to the organism which was represented by the Meeting when it first assembled, retained all the attributes of a regularly constituted Quarterly Meeting, and having been since continuously recognized by the proper Western Yearly Meeting as the true White Lick Quarterly Meeting, that recognition is binding upon us as the decision of a tribunal having a peculiar jurisdiction to decide such and all kindred questions, and is hence practically decisive of the controlling question in issue in this cause.

Numerous questions were reserved at the trial by the cross complainant upon offers and rejection of evidence. The excluded evidence, concerning which complaint is made, all had reference to the faith, doctrine, usages or modes of worship of the Society of Friends, and was offered as tending to establish either the orthodoxy of the cross complainant in such matters on the one side, or the heterodoxy of the plaintiff on the other.

The inference from what has been said necessarily is that the court did not err in excluding the rejected evidence. Our laws have erected no standard by which either the orthodoxy or heterodoxy of a religious body may be judged, and will not impose any implied sectarian limitations or restrictions upon charities which have not been expressly so limited or restricted. It was not at any time proposed to show that either the Western Yearly Meeting or the White Lick Quarterly Meeting had, in its organic capacity, at any time authorized or sanctioned any innovation upon the faith or doctrines of the Society, or any essential departure in its usages or practices. All that was proposed had reference to alleged disorderly conduct on the part of individual members of the Society which had not been taken notice of by any of the Meetings within the Western Yearly Meeting limits, and of which no formal complaint was ever seemingly made to any Meeting.

The evidence impresses us as not establishing such an in-

flexible rule regarding the faith, doctrines and practices of the Society of Friends as is contended for by the cross complainant.

Clarkson, a writer of note on the subject of Quakerism, in treating upon the nature and jurisdiction of Yearly Meetings, at page 95, says: "Among the subjects introduced at this Meeting may be that of any new regulations for the government of the Society. The Quakers are not so blindly attached to antiquity as to keep to customs merely because they are of ancient date; but they are ready, on conviction, to change, alter and improve."

In the case of *Earle* v. *Wood, supra,* in a very elaborate opinion delivered by Chief Justice SHAW, the Supreme Court of Massachusetts said:

"It would seem to be inconsistent with the nature and principles of the Quaker system, as far as it is disclosed in the case before us, to be bound down, as a body, as a Christian denomination, to a precise and unbending rule in matters of speculative opinion. They profess to believe in the continued influence and presence of the Holy Spirit to the mind of each individual, humbly waiting for its manifestation to aid in the discovery of divine truth. It would seem, therefore, that they must suppose it possible, that new truths may be discovered and so manifested as to require the assent of the true disciple, and thus add something to his existing faith. It is also true, as we understand, that they profess to believe that the Scriptures are given by inspiration, and are the unerring guide to Christian truth; and that if any man supposes he has an inward light, contrary or repugnant to the truth of the scriptures, it can not be a true light. But perhaps there is no inconsistency in believing that the Scriptures of the Old and New Testaments are a true and unerring guide to divine truth, yet that all the truths of Scripture have not been made manifest to the imperfect mind of man, and in the language of Father Robinson, of Leyden, that 'More truth is yet to

break forth from the Holy Scriptures.' Should such be the fact; should the testimony of the·Scriptures and the influences of the Holy Spirit concur in bringing to the conviction of humble, sincere and enquiring minds, the knowledge of further Christian truths, manifested with a brilliancy and clearness not to be mistaken; it seems perfectly consistent with the avowed principles of the Society of Friends, to adopt and sanction them, although they were not known to Pennington, Barclay, Fox and the respected founders of their Society, and under a full belief that if the same light had been thrown on the. same truths in their day, these sincere and seeking men would have humbly and devoutly embraced them.

" We would not be supposed by this, to intimate that the Quakers have no creed, no theological tenets, to which they are strongly attached, and no superintending watchfulness over the soundness of the faith of their members and subordinate Meetings, or that they allow any great latitude of discussion to their members on theological subjects. On the contrary, the discipline expressly prohibits the publication of all writings relating to their religious principles or testimonies' unless first laid before the meeting for sufferings, for their advice and concurrence, and their approval of them obtained.

" What we mean to say is this; that if after solid and weighty consideration, humbly and conscientiously awaiting the guide of best wisdom, the Yearly Meeting should fully unite in the proper as well as the Quaker sense of that term, in adopting some modification of their creed, or of their speculative opinions, adhering to their great principles of love and fraternal duty, it would, upon their professed principles, seem too much to say, that they would thereby cease to be Quakers, and cease to be the Society of Friends. Especially we think, this could not be asserted by Meetings and individuals subordinate to them, who owe, ecclesiastically, allegiance to them, and to whom, so long as they remain subordinate, the decisions are final and infallible, as well in matters of faith as of conduct."

It is a matter deducible from history, as well as ·from the

White Lick Quar. Meet. of Friends *v.* White Lick Quar. Meet. of Friends.

current religious literature of the times, that every church and every principal ecclesiastical denomination claiming to be founded upon Christian principles, or composed of persons calling themselves Christians, has within itself some *quasi* legislative or supreme power having control over matters of doctrine as well as discipline, and having some jurisdiction at least over what pertains to the faith ·as well as the practices of its members. With the knowledge of this fact in our minds, and with the evidence in this case before us, we can not say that the extract, taken as above from the opinion delivered by Chief Justice SHAW, states the power of the Yearly Meetings in ecclesiastical affairs too strongly, and especially when they act in unity and in co-operation with each other.

What we have said and set out as above on the subject of the ultimate and possibly extreme power of the Yearly Meetings over matters of doctrine as well as discipline, has no material bearing upon any question directly involved in this case, but it has an application to questions which arose incidentally at the trial, and which have been earnestly and elaborately discussed by counsel in this court. We have, consequently, felt justified in referring thus generally to that subject and making some expression of opinion upon it.

A careful review of all that has been presented in derogation of the proceedings below has failed to disclose any sufficient reason for a reversal of the judgment. *Gibson* v. *Armstrong,* 7 B. Monroe, 481 ; *Bouldin* v. *Alexander,* 15 Wal. 131 ; *Kniskern* v. *Lutheran Churches,* 1 Sandf. Ch. 439 ; *Watson* v. *Garvin,* 54 Mo. 353 ; *Hale* v. *Everett,* 53 N. H. 9 (16 Am. R. 82) ; *Connitt* v. *Reformed P. D. Church,* 54 N. Y. 551 ; *Dutch Church* v. *Bradford,* 8 Cowen, 457 ; *Dieffendorf* v. *R. C. Church,* 20 Johns. 12 ; *Ferraria* v. *Vasconcellos,* 31 Ill. 25 ; *Brunnenmeyer* v. *Buhre,* 32 Ill. 183 ; *Happy* v. *Morton,* 33 Ill. 398 ; *Field* v. *Field,* 9 Wend. 394 ; *Gaff* v. *Greer,* 88 Ind. 122.

The judgment is affirmed, at the costs of the appellant, the cross complainant in the court below.