## BENTLE, SR., ET AL. *v.* ULAY ET AL.

[No. 6,947. Filed December 30, 1910.]

1. APPEAL.— *Transfer.— Erroneous Ruling Precedent.*— Where a ruling precedent of the Supreme Court is considered erroneous, the Appellate Court is required to transfer the pending case to the Supreme Court, stating its reasons therefor. p. 661.

2. RELIGIOUS SOCIETIES.—*Church and State.—Constitutional Law.* —The church and the State must be kept separate; and the only constitutional guaranty on the subject is that of freedom of worship to the individual. p. 661.

3. RELIGIOUS SOCIETIES.—*Consolidation.—Rights Involved.*—In an action by the Presbyterian Church of the United States of America to secure the property of the Cumberland Presbyterian Church, by virtue of an alleged consolidation, property, and not purely ecclesiastical, rights, are involved. p. 662.

4. RELIGIOUS SOCIETIES.— *Consolidation.— Courts.— Jurisdiction.*— In an action by a church to secure the real estate owned by another church, a consolidation of the latter with the former being alleged, the civil courts have jurisdiction not only to determine the civil rights of the claimants, but also ecclesiastical rights, where necessarily involved. p. 662.

5. RELIGIOUS SOCIETIES.—*Schisms.—Property.*—Where a religious body has become divided its property will be given to that faction acting in harmony with its own law. p. 663.

6. RELIGIOUS SOCIETIES.—*Judicial Questions.—Decisions.—Effect.*— The decision of the general assembly of the Cumberland Presbyterian Church in deciding a question not judicially before it is not binding on the courts. p. 664.

7. COURTS.—*Judges.*—*Interest.*—*Churches.*—A decision by a judge, in a case in which he is interested, is, at least, voidable, and this applies to a church organization as well. p. 667.

8. RELIGIOUS SOCIETIES.—*Beneficial Associations.*—*Similarity.*—Religious societies and beneficial associations are governed by similar legal principles, *Ramsey* v. *Hicks,* 174 Ind. 428, *contra.* p. 670.

From . Superior Court of Vanderburgh County; *Alexander Gilchrist,* Judge.

Action by Jerome D. Ulay and others against William Bentle, Sr., and others. From a judgment for plaintiffs, defendants appeal. *Transferred to Supreme Court.*

*William Reister, W. C. Caldwell* and *George W. Shaw,* for appellants.

*John M. Gaut, J. E. Williamson, W. H. Hill, H. D. Henkle* and *C. B. Kessinger,* for appellees.

ROBY, C. J.—The questions involved in this appeal have been discussed to some extent by both the Appellate Court and the Supreme Court. *Ramsey* v. *Hicks* (1909), 44 Ind. App. 490; *Ramsey* v. *Hicks* (1910), 174 Ind. 428. Ordinarily the conclusion announced by the Supreme Court would be followed at this time without a remark, but the principles involved are so important and the last decision so revolutionary that, in accordance with a mandatory legislative requirement, we must transfer the case to the Supreme Court, with the recommendation that its decision in the case of *Ramsey* v. *Hicks, supra,* be overruled.

The absolute separation of church and state is a fundamental principle. Religious liberty is guaranteed to the individual. There is no constitutional provision safeguarding religious denominations, except through the persons composing them, and the absolute freedom of the individual to believe and worship as his conscience dictates is amply declared. No coercion of religious belief can lawfully exist.· It matters not whether the means employed be torture of the body, deprivation of property or other force, it is unlawful. Nor does it matter by whom

attempted, the law will not tolerate it. A religious denomination has no more right to coerce its members, or any of them, than one individual has to coerce another.

The opinion of the Supreme Court in *Ramsey* v. *Hicks*, *supra*, proceeds upon the theory that the state discharges its full duty by keeping "hands off." It would be exactly the same thing to hold that the state does its full duty if it does not itself despoil its subjects. The adoption of such a standard would leave every individual at the mercy of business, or other associates. . It is, however, the duty of the state not only to abstain from wrongdoing itself, but to protect each citizen from the depredation of others. So long as the difference is one of mere belief, it is passive, but the moment that any combination or society, under the pretext of religion or religious observance, undertakes to imprison one of its number, or deprive him of his property or of his share in or use of the common property, then the state becomes actively interested.

3. The opinion in the case under examination contains the statement that "no personal or pecuniary rights are involved in this controversy." It would be difficult for the members of the Cumberland Presbyterian Church to believe it.

In the same connection it is said that the action taken by the general assembly "was purely ecclesiastical, and its effect upon the church property was resultant and consequential."

4. It is conceded that the effect was resultant. It was indeed necessarily resultant, and could not fail to transfer the property of the Cumberland Presbyterian Church to the Presbyterian Church in the United States of America. And when the ownership of real estate is in question, and such action with its resultant consequence is relied upon as a link in a chain of title, it becomes a matter for the civil courts, exactly as was the case in *Smith* v. *Pedigo* (1896), 145 Ind. 361, 19 L. R. A. 433, and in *White*

*Lick Quarterly Meeting, etc.,* v. *White Lick Quarterly Meeting, etc.* (1883), 89 Ind. 136, and in all other cases where property rights are at stake.

That questions of doctrine will be determined by the civil courts when necessary to the settlement of property rights, has been too often declared in this State to be now denied. See authorities cited in *Ramsey* v. *Hicks* (1909), 44 Ind. App. 490, 512-519. To hold otherwise would be to permit persons to be deprived of property without due process of law, and hence in violation of both state and federal Constitutions.

It was necessary to the decision in *Ramsey* v. *Hicks* (1910), 174 Ind. 428, in terms to overrule *Hatfield* v. *De Long* (1901), 156 Ind. 207, 51 L. R. A. 751, 83 Am. St. 194. The opinion in the case overruled was prepared by a judge distinguished not only for his intellectual attainments, but for his integrity and regard for judicial proprieties. Three present members of the Supreme Court participated in that decision.

The decision last made is also in conflict with the following cases: *Smith* v. *Pedigo, supra, White Lick Quarterly Meeting, etc.,* v. *White Lick Quarterly Meeting, etc.,* 5. *supra,* and *Gaff* v. *Greer* (1882), 88 Ind. 122, 45 Am. Rep. 449. These cases are not distinguishable upon the point in issue. They are cases in which a majority in a church possessing a congregational form of government undertook to change doctrine, and hold common property over the objection of a minority, and the law was declared to be that "the title to the property of a divided church is in that part of the organization which is acting in harmony with its own law; and the ecclesiastical laws, usages, customs, principles and practices, which were accepted and adopted by the church before the division took place, constitute the standard for determining which of the contesting parties is in the right." *White Lick Quarterly Meeting, etc.,* v. *White Lick Quarterly Meeting, etc., supra,* p.

156.   An attempt is made to distinguish these cases, based upon the fact that the Cumberland Presbyterian Church has a system of judicature.

The case of *Watson* v. *Jones* (1871), 13 Wall. 679, 20 L. Ed. 666, is a leading case upon the subject, and contains a classification which has been generally adopted.   An item thereof is as follows:   ''The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization.''   While this case is not cited in the opinion under consideration, those cases which are cited follow and depend upon it.   Justice Miller, in the course of his opinion, said:   ''The case before us is one of this class, growing out of a schism which has divided the congregation and its officers, and the presbytery and synod, and which appeals to the courts to determine the right to the use of the property so acquired.''

It thus appears that the case of *Watson* v. *Jones, supra,* does not authorize a majority to change doctrine and appropriate common property over the objection of a minority.   It held that a schism which divided a congregation, and had been appealed to a church court, and judicially determined there, would not be reinvestigated by the civil courts, but that they would adopt the decision of the church court as final.

Doctrine can only be changed and common property held by conforming to the strict law of the church, whatever its form of government.   The question involved in the case of *Ramsey* v. *Hicks, supra,* and in the case at bar is whether the action of the majority of the Cumberland Presbyterian Church was in accordance with the law of that church.   It is claimed by the Presbyterian Church of the United States of America that such action

was legal, and that it thereby acquired the property in controversy. It says that the union was legal, because the church court held that it was legal, and that such decision is final. It denies the power of the state courts to go behind the action of the majority of the general assembly of the Cumberland Presbyterian Church, and the holding of the Supreme Court at this time sustains its position.

It has been heretofore pointed out by this court that no appeal was ever taken to the general assembly, for the reason that the schism arose in that body, and the doctrine of *Watson* v. *Jones, supra,* and cases following it, does not apply, there having never been either a judicial hearing or a judgment. If this is true, appellants' title fails, as would that of a majority of a congregational church attempting to change the doctrine and transfer property by force of numbers. Had a controversy arisen in the Cumberland Presbyterian Church of Monroe City, and had it been duly submitted to the general assembly, acting in its judicial capacity, and been by it determined, then the doctrine of *Watson* v. *Jones, supra,* would apply, and the cases following it would be in point; but even then the judgment rendered would be before the state court, as any other judgment presented in evidence would be, and of course subject to the same tests. If the action of the general assembly is to have the effect of a judgment, it necessarily follows that it is to be received and scrutinized as the judgment of any other court.

In the case of *Hatfield* v. *DeLong, supra,* it was held that a member of a church who had been tried by a church court might attack its judgment for fraud in selecting its members. This was but an application of the rule that fraud vitiates judgments. ''Courts of equity have inherent power to annul judgments and decrees obtained by any means amounting to fraud. If it is made to appear that the successful party to the suit did something, or caused it to be done, which prevented a real contest in the trial or hearing

of the case, a court will not hesitate to open the case for a new hearing upon its merits." *Pepin* v. *Lautman* (1901), 28 Ind. App. 74; *Gorman* v. *Johnson* (1910), *post*, 672; *Nealis* v. *Dicks* (1880), 72 Ind. 374.

The following excerpt from Broom's Legal Maxims (8th ed.) *341, *342, is pertinent: "But although the judgment of a court of competent jurisdiction upon the same matter will, in general, be conclusive between the same parties, such a judgment may nevertheless be set aside on the ground of mistake, or may be impeached on the ground of fraud; for 'fraud,' in the language of DeGrey, C. J., 'is an extrinsic collateral act, which vitiates the most solemn proceedings of courts of justice.' Lord Coke says 'it avoids all judicial acts, ecclesiastical or temporal.' And in a modern case before the House of Lords, it was observed, that the validity of a decree of a court of competent jurisdiction upon parties legally before it may be questioned, on the ground that 'it was pronounced through fraud, contrivance, or covin of any description, or not in a real suit, or, if pronounced in a real and substantial suit, between parties who were really not in contest with each other.'"

The case of *Ramsey* v. *Hicks* (1910), 174 Ind. 428, creates an exception to this rule. Under it fraud practiced by a church court has such virtue that it not only becomes the law of the church but the law of the state, as well, leaving to the state courts no option except to secure to the wrongdoer the fruits of his fraud. It is respectfully submitted that the case of *Hatfield* v. *DeLong, supra,* should be rehabilitated, and the later case in conflict with it be in turn overruled.

If the proceedings by which it is claimed that the property of the Cumberland Presbyterian Church was transferred to the Presbyterian Church in the United States of America were in accordance with the law of the former church, then they were effective. If they were legal, it is because the decision of the general assembly had made them

so, and in determining whether the law of the church was complied with, the state court must determine whether the assembly had jurisdiction and whether a valid judgment was rendered by it. This is the point in issue. *Ramsey* v. *Hicks, supra,* holds that the taking of action by a majority of the general assembly forecloses inquiry. This is exactly as though the action of a majority in a congregational church was made final. The dispute in the general assembly of the Cumberland Presbyterian Church was never investigated by any court, ecclesiastical or otherwise, and the majority of the general assembly were disqualified from judicially determining the merit of the controversy. A faction of the assembly of the Cumberland Presbyterian Church desired to unite with the Presbyterian Church in the United States of America. That faction proceeded to institute a proceeding to bring about that end. Such proceeding had its inception in said general assembly, and not in the

7. Monroe City congregation. If this body had power both to institute and to decide, to be advocate and judge, then the ancient maxim must be obsolete. The maxim is: *"Nemo debet esse judex in propria causa"*— no one ought to be a judge in his own cause. *Board, etc.,* v. *Heaston* (1896), 144 Ind. 583, 591, 55 Am. St. 192.

"A leading case in illustration of this maxim is *Dimes* v. *Grand Junction Canal* [1852], 3 H. L. Cas. *759, where the facts were as under:—the canal company filed a bill in equity against a landowner in a matter touching their interest as copyholders in certain land. The suit was heard before the Vice-Chancellor, who granted the relief sought by the company, and the Lord Chancellor—who was a shareholder in the company, this fact being unknown to the defendant in the suit—affirmed the order of the Vice-Chancellor. It was held on appeal to the House of Lords that the decree of the Lord Chancellor was under the circumstances voidable and ought to be reversed. Lord Campbell, C. J., observing: 'It is of the last importance that the maxim

that ''no man is to be a judge in his own cause'' should be
held sacred. And that is not to be confined to a cause in
which he is a party, but applies to a cause in which he has an
interest.' * * * We have again and again set aside pro-
ceedings in inferior tribunals, because an individual, who
had an interest in a cause, took a part in the decision. And
it will have a most salutary effect on these tribunals when
it is known that this high court of last resort, in a case in
which the Lord Chancellor of England had an interest, con-
sidered that his decree was on that account a decree not ac-
cording to law, and should be set aside. This will be a les-
son to all inferior tribunals to take care, not only that in
their decrees they are not influenced by their personal in-
terest, but to avoid the appearance of laboring under such
an influence.' '' Broom's Legal Maxims (8th ed.) *117.

The members of neither faction were qualified to adjudi-
cate the controversy in which they were actors.

As a matter of fact, nothing in the nature of a trial or
adjudication was had. It has never been asserted that the
doctrine of the Presbyterian Church in the United States of
America has been changed to conform to that of the Cum-
berland Presbyterian Church, but the majority declared
that it was near enough, and thereupon the meeting ''broke
up in a row.'' There was no vestige of judicial delibera-
tion, and the first opportunity offered for such a hearing is
in the state court. But suppose that the general assembly
was acting as a court. The effect of the proposed union
would be to vest a large amount of property in the Presby-
terian Church in the United States of America. Its hold-
ings would thereby be greatly increased and its resources
enlarged. Would a member of that church be competent
to sit as a juror in a trial involving the legality of the
union? No judge would refuse to sustain a challenge for
cause based upon such fact, and a motion for a new trial,
based upon such disqualification undisclosed, would never

be denied. It cannot be that the standard by which the competency of a juror is measured is too high for use when the impartiality of a judge is to be settled. The disqualification does not cease with members of the Presbyterian Church in the United States of America. No one will pretend that they possess the requisite impartiality. It extends to the majority members of the Cumberland general assembly. Their interests and those of the Presbyterian church are identical. The merger, so far as religious attitude is concerned, is, as to them, complete. All that remains is a question of property, and as to that they are not and never have been impartial. The disqualification that prevents them from sitting as judges or jurors in their own cases, when disregarded, amounts to fraud in the selection of the court, such as was held to invalidate the judgment in the case of *Hatfield* v. *DeLong, supra.* The case of *Ramsey* v. *Hicks* (1910), 174 Ind. 428, as it stands, is authority for the propositions that members of a church court may institute a proceeding, and decide it in their own favor, and that fraud does not invalidate judgments. Under its doctrine it would be lawful and proper for a trustee and member of the Presbyterian Church in the United States of America, who happened to be a judge of the circuit court, the Appellate Court or the Supreme Court, to sit in, hear and decide a proceeding by which the organization whose financial and other interests were in his keeping would be reinforced and enriched. Such a judgment is not ''according to law.'' But it is said in the opinion, that ''no man can hope to receive pecuniary profit from his religious membership.'' He has read history to no avail who, because of this somewhat doubtful fact, imagines that religious prejudice is not sufficiently powerful to sway its possessor.

The errors pointed out are elemental, and can only be cured by overruling the case. Minor inaccuracies have

therefore been ignored.   There is, however, one prop-
8.   osition enunciated by the opinion in the case of *Ram-
sey* v. *Hicks* (1910), 174 Ind. 428, which is too serious
to be so passed.   It is as follows:   "It is not accurate nor
correct to say that an association for religious worship is
like an ordinary fraternal or beneficial society or social club,
and its membership and affairs to be determined by the same
legal principles, since the one is founded upon a distinctive
conception of the relation and duty of man to his Maker
and the other is concerned only with the relation of man to
his fellows."

The true rule was stated by Mr. Justice Miller in the case
of *Watson* v. *Jones, supra,* at page 417:   "Religious organi-
zations come before us in the same attitude as other volun-
tary associations for benevolent or charitable purposes, and
their rights of property or of contract, are equally under
the protection of the law, and the actions of its members
subject to its restraints.   Conscious as we may be of the
excited feeling engendered by this controversy, and of the
extent to which it has agitated the intelligent and pious
body of Christians in whose bosom it originated, we enter
upon its consideration with the satisfaction of knowing that
the principles on which we are to decide so much of it as is
proper for our decision, are those applicable alike to all of
its class, and that our duty is the simple one of applying
those principles to the facts before us."   This quotation is
taken from a case involving a church controversy.   In the
case of *Supreme Lodge, etc.,* v. *Knight* (1889), 117 Ind.
489, 497, 3 L. R. A. 409, a fraternal society case, Judge
Elliott said:   "The principle which rules here is strictly
analogous to those which prevail in controversy between the
officers and members of religious organizations."

It would seem that the rule is settled by these authorities.
If there is a reason for disregarding them, it is to be found
in the language just quoted from the case of *Ramsey* v.
*Hicks* (1910), 174 Ind. 428.   The fact that fraternal soci-

eties are concerned "with the relation of man to his fel-
lows" is surely not good ground for departure or distinc-
tion.    The church that is not so concerned is not Christian.

The statement that fraternal societies are "concerned
only" with such relation, purports to be a statement of fact.
It is not deducible from anything contained in the rec-
ord, but is an unwarranted assumption.    There are many
associations.    The members of each one may know what the
scope of the common effort is, but how can any one man set
limits upon them all?    As a matter of common report it
might truthfully be said that some at least of these soci-
eties have a conception of the duty of man to God, which
is as lofty and pure as that found in the Westminster creed.
If there were such a difference between church and frater-
nal society as asserted, it would still not be a basis for the
application of a different rule of law to them.    The Mor-
mon church is founded upon "a distinct conception of the
relation and duty of man to his Maker."    So is the relig-
ion of Mohammed.    But can it be possible that this fact
would entitle them to any greater privileges in the courts
than are accorded to Odd Fellows, Pythians or Masons?
This would be the necessary effect of the new rule, unless
"the distinctive conception," to be operative, must be one
that accords with the idea or belief of those who administer
the law, and when thus qualified it is the rule of the four-
teenth century, and out of place in Indiana.

In transferring this case, with the recommendations here-
tofore stated, it may not be improper to say that if some of
the language of the transferring opinion seems harsh, it is
because the facts considered are harsh facts.    The transfer
is made with the utmost respect, and with confidence that
the court to which the record goes will refuse to permit the
doctrine of the case of *Ramsey* v. *Hicks, supra,* longer to
have the sanction of its great name.

Transferred to the Supreme Court.

Comstock, Hadley, Watson, Rabb and Myers, JJ., concur.