REORGANIZED CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS v. CHURCH OF CHRIST et al.

(Circuit Court, W. D. Missouri, W. D.    March 3, 1894.)

1. RELIGIOUS ASSOCIATIONS—TITLE TO LAND—INCORPORATION.
    The general conference of a religious association directed that articles of incorporation be drawn up and filed in accordance with the laws of the state, and one of these provided that all property held in trust for the church should vest in the corporation, to whom the trustees were directed to transfer it, and that the corporation might sue for and recover the same. *Held,* that this constituted a valid transfer of the equitable interest of the members of the association to the corporation, and authorized the corporation to maintain suits relating to former church property in its own name.

2. SAME—FOREIGN CORPORATIONS.
    Const. Mo. art. 2, § 8, provides that "no religious corporation can be established in this state, except such as may be created under a general law, for the purpose only of holding title to such real estate as may be prescribed by law for church edifices, parsonages and cemeteries." *Held,* that this does not prohibit a foreign religious corporation from holding land in Missouri for the purposes specified.

3. SAME—COLLATERAL PROCEEDINGS.
    The question whether a foreign religious corporation has attempted to acquire more land than it is allowed to hold (Rev. St. Mo. § 2833) is one which can be determined only in a direct proceeding by the state.

4. TRUSTS—CONSTRUCTIVE—WHAT CONSTITUTES.
    Land was conveyed to an individual in his own name, but it was shown that he was a bishop in a certain church or religious body; that money was raised by its members to purchase land whereon to build a temple, which money was given to him for that purpose; that for many years the land in question had been known as the "Temple Lot;" that it had been dedicated with religious services by the head of the order; and that, when the grantee left the state, he executed what purported to be a declaration of trust upon such land in favor of the church. *Held,* that the original grant was impressed with a trust in favor of the church.

5. EVIDENCE—DOCUMENTS—DEEDS—ACKNOWLEDGMENT.
    Rev. St. Mo. § 4860, authorizes a copy of a recorded deed to be read in evidence, although it was not recorded within a year after execution, upon such evidence as, together with the certificate of acknowledgment, shall satisfy the court that the instrument was executed by the person named therein as grantor. A deed executed in 1839 was not recorded until 1870, but it purported to have been acknowledged, when executed, before an officer who was a member of the church in which the grantor was a bishop. *Held,* that a copy of the recorded deed was admissible.

6. TRUSTS—DECLARATION—INTERPRETATION.
    An instrument purporting to be a declaration of trust recited that C. had given the grantor money to buy land for the benefit of a church, and that he had bought such land in his own name; and, in consideration of $1,000, paid to him by C., he thereby granted such land to certain of C.'s children, it being intended for the use of the church. *Held,* that this consideration had reference to the money whose receipt was recited in the premises, and it in no wise discharges the land from the trust.

7. BONA FIDE PURCHASER—EVIDENCE.
    A *subsequent purchaser,* to entitle him to hold as against a prior unrecorded deed, must show that he purchased without notice of the prior

deed, and for a valuable consideration, and the mere recital in the deed under which he claims of the receipt of the purchase money is not sufficient proof of the fact of payment as against third parties.

8. RELIGIOUS ASSOCIATIONS—SCHISMS—TITLE TO LAND.

As between two opposing factions of a religious association, land acquired by the association before any schism arose will be adjudged the property of that faction which abides by the doctrines, principles, and rules of church government which the united body professed when the property was acquired.

9. EQUITY—LACHES—WHAT CONSTITUTES.

A certain religious body was driven from a state by military force, and such was the popular hostility against it that for many years thereafter its members would not have been allowed to return. Some 40 years afterwards, land within the state, which was held in trust for this body, was occupied by an adverse claimant, and within 10 years thereafter its representatives filed a bill against such occupants to establish the trust. *Held,* that the claim was not stale, nor was there any laches on complainant's part.

This was a suit by the Reorganized Church of Jesus Christ of Latter-Day Saints against the Church of Christ and others to declare a trust as to certain real estate in favor of the complainant.

This is a bill in equity to declare a trust in favor of the complainant, a religious body, as to certain real estate situate at Independence, county of Jackson, state of Missouri, known as the "Temple Lot." The controversy is between two divisions of what is popularly known as the "Mormon Church." The lot in controversy was bought in 1832 by one Partridge, bishop of the then Church of Jesus Christ of Latter-Day Saints, with its central organization at Kirtland, Ohio, with funds furnished by said church for such purpose. In the view of the church this spot was to be the future site on which was to be erected the great temple of the church, and was to be to it the New Jerusalem. In 1839 said Partridge made the following deed, declaratory of said trust:

"Know all men that whereas there was money put in my hands, to wit, in the hands of Edward Partridge, by Oliver Cowdery, an elder in the Church of Latter-Day Saints, formerly of Kirtland, state of Ohio, for the purpose of entering lands in the state of Missouri, in the name of and for the benefit of said church; and whereas, I, Edward Partridge, was bishop of and in said church, he took said money and funds thus put in his hands and entered the land in his own name, in the county of Jackson, state of Missouri, in the name of Edward Partridge, the signer of this deed: Now know ye, for the furthering the ends of justice, and as I have to leave the state of Missouri by order of Governor Boggs, and with me also our church, I do, for the sum of one thousand dollars, to me in hand paid by said Oliver Cowdery, do give, grant, bargain, and sell to John Cowdery, son of Oliver Cowdery, now seven years old, and Jane Cowdery, three years, and Joseph Smith Cowdery, one year old, all the lands entered in my name in the county of Jackson, in the district of Lexington, in the state of Missouri. Said Edward Partridge, the first party, and signer of this deed, does also sell, alien, and confirm to the aforesaid John Cowdery all real estate and lands he hath both entered as aforesaid, and all he owns in his own name by private purchase and holds by deed of gift, being intended for the use of the Church of Latter-Day Saints or otherwise. This sale is to embrace all lots of all sizes, situated in Independence, and to embrace the lot known as the 'Temple Lot,' and all other lands of whatever description said Partridge, the first party, is entitled to in said Jackson county, in the state of Missouri. Said Partridge also agrees to amend this deed to said Oliver Cowdery at any time for the purposes aforesaid.

"Given under my hand and seal on the date above written.

"Edward Partridge. [Seal.]

"E. G. Gates, Witness."

"State of Missouri, Caldwell County—ss.:

"Be it remembered, that on the 25th day of March, 1839, before the undersigned, one of the justices of the county court in and for said county, came Edward Partridge, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument of writing as party thereto, and did acknowledge the same to be his act and deed for the purposes therein mentioned.                                             Elias Higbee, J. C. C. C."

"The foregoing deed, with the acknowledgment thereon from Edward Partridge to Jane Cowdery et al., was filed and duly recorded in my office on the 7th day of February, A. D. 1870.          A. Comingo, Recorder,
                                         "By H. G. Goodman, Deputy."

Partridge left the state about that time, and died in 1841. One Poole, who lived at Independence, Mo., in 1848 hunted up the heirs, five in number, of said Partridge, in the state of Iowa, and obtained from three of them a purported deed (acknowledged- in Missouri). to the 63 acres of land at Independence, so deeded by said Partridge to Oliver Cowdery, including the temple lot, which lot contains about 2½ acres. The said trust deed from Partridge was not put on record in said Jackson county, Mo., until 1870. Other mesne conveyances of this property were made under the Poole deed. The lot in question remained vacant and unoccupied until 1882, when the respondent church took possession of it, claiming title thereto under deeds made to one Hedrick in trust for the respondent church, and by adverse possession. This action was brought within 10 years after respondent took possession of the property. The evidence in the case tends to show that the said grantees under the Partridge deed died during their minority, and that one Marie Louise Johnson is the sole surviving sister and heir of said Cowdery children. On the 9th day of June, 1887, she and her husband, Charles Johnson, executed and delivered a deed of quitclaim to said lot to George A. Blakeslee, bishop of the complainant church, in trust for the benefit of said church, which deed was duly acknowledged on the 9th day of June, 1887, and filed for record on the 10th day of June, 1887, in the recorder's office of Jackson county, Missouri. The complainant church was thereafter duly incorporated under the laws of the state of Iowa. The other important facts of the case will sufficiently appear from the opinion herein.

P. P. Kelley, Geo. Edmunds, and L. Traber, for complainant.
John N. Southern and Jas. O. Broadhead, for respondents.

PHILIPS, District Judge (after stating the facts). 1. Question is made, at the threshold of this case, as to the power of the complaining corporation to maintain this suit. The broad proposition is asserted that a foreign corporation has no right, under the laws of Missouri, to hold or own real estate in the state. Under the statutes of Iowa, where complainant was incorporated, most liberal and plenary provisions are made for the incorporation of all manner of beneficent, charitable, and religious associations. St. Iowa, c. 2, tit. 9, p. 275. Section 1095 provides that "any three or more persons of full age, citizens of the United States, a majority of whom shall be citizens of this state, who desire to associate themselves for benevolent, charitable, religious or missionary purposes, may make, sign and acknowledge before" a prescribed officer, "and have recorded in the office of the recorder of the county in which the business of such society is to be conducted, a certificate in writing," etc., "in which shall be stated the name or title by which such society shall be known, the particular business and objects of such society, the number of trustees, directors," etc. Section 1096 declares that upon the filing for record such certificate the persons so signing and their

associates and successors "shall by virtue hereof be a body politic and corporate, * * * and by that name they and their successors shall and may have succession, and shall be persons capable of suing and being sued, and may have and use a common seal," etc.; "and they and their successors by their corporate name shall be capable of taking, receiving, purchasing and holding real and personal estate." Section 1097 provides that such religious associations may nominate and appoint such trustees, directors, or managers for the corporation, "according to usages of the appointing body," etc. Section 1101 declares that "any corporation formed under this chapter shall be capable of taking, holding or receiving property by virtue of any devise or bequest contained in any last will or testament." And the only limitation imposed by this statute upon the power of such corporation to take and hold property is contained in the last clause of the last-named section, which declares that "no person leaving a wife, child or parent, shall devise or bequeath * * * more than one-fourth of his estate after the payment of debts." Section 1102 declares that the trustees, etc., of existing religious corporations may, by conforming to the requirements of said section 1095, "reincorporate themselves, or continue their existing corporate powers, and all the property and effects of such existing corporation shall vest in and belong to the corporation so reincorporated or continued." This association was incorporated in conformity to this statute. But it is insisted by respondents that the mere incorporation of the religious association did not have the effect, ipso facto, to vest the property of the church in the corporation, so as to authorize the legal entity to sue therefor. The case of Catholic Church v. Tofbein, 82 Mo. 418, is relied on. Tofbein, by his will, devised the property "to the Catholic Church at the city of Lexington, Missouri." Afterwards said church was incorporated under the General Statutes. It was held that, as the devise was to the church, and took effect before the act of incorporation, the mere fact of an incorporation by that name, without more, did not have the effect to transfer to the corporation the property devised to the church, as such, any more than if the incorporators had taken some other name; citing the case of Frank v. Drenkhahn, 76 Mo. 508, as "directly in point." In the latter case the conveyance was to a number of individuals, directors of a voluntary joint-stock association, "and their successors in office, in special trust for the use of the shareholders in said company." Afterwards the members of said company were incorporated by act of the legislature under the name of the "St. Louis and Birmingham Iron Company." Under judgment obtained against the corporation this property was sold, and ejectment was brought, predicated of the sheriff's deed. The court held that, as no transfer was shown from the grantees in the deed, or from the shareholders in the joint-stock company to the corporation, there was nothing to show succession of right in the corporation to the property. But the case here is essentially different.

The theory of the complainant is that this property was acquired originally with church funds, and was and is held in trust for the use of the Church of Jesus Christ of Latter-Day Saints, which later

took the name of the "Reorganized Church of Jesus Christ of Latter-Day Saints." This church, according to its ecclesiastical polity, rules, and system of government, at its annual general conference, April 6, 1891, directed and authorized the articles of association and incorporation. This conference represented the ecclesiastical body in its entirety. And, as stated in the deposition of Bishop Kelley:

"The church at Lamoni [Iowa], effected the articles of incorporation, because that is the central church, and all others are simply branches of that church. It is the headquarters,—the principal place of business,—and was made the principal place of business by the common consent of the body, which is the rule of action of the body."

The articles of association were presented to, voted on and adopted by, the authorized delegates of the church, by the sixth article of which it is provided that:

"All property now held or owned by said church in the name of any person or persons, as trustees or otherwise, including the publication establishment at Plano, Illinois, shall vest in said corporation; and all persons holding such property in trust for said church are hereby directed and required to transfer and convey the same to said corporation as the property of said church; and said corporation shall, by operation of law, succeed to all property now owned by said church, or held for its use, and may sue and recover the same in the name of said corporation."

This was the act of transfer of the equitable interest of the members of the church association—the beneficiaries of the trust estate—to the corporation. Such religious bodies are sui generis, and this was the only method by which this equity could be conferred upon the incorporators,—by articles in writing, duly adopted and attested at its church meeting. This equity being held by the incorporators, it certainly was competent for them, in adopting the articles of incorporation, to provide and declare, as they did in the sixth article thereof, that the property held or owned by the church in the name of any person or persons, as trustees or otherwise, should vest in said corporation.

2. I understand the law of comity to be well established that a corporation of one state, if not forbidden by its charter, may exert its powers in any other state of the Union, so as to take and hold real estate therein, unless interdicted by the positive law or declared policy of such other state. Wright v. Lee (S. D.) 51 N. W. 706, 55 N. W. 931; Barnes v. Suddard, 117 Ill. 237, 7 N. E. 477. This question was fully considered and settled in the case of Christian Union v. Yount, 101 U. S. 352. See, also, Lancaster v. Improvement Co. (N. Y. App.) 35 N. E. 964. The respondents invoke section 8, art. 2, of the state constitution of Missouri for the position that a foreign corporation has no right to hold or own lands in this state. Said section is as follows:

"That no religious corporation can be established in this state, except such as may be created under a general law, for the purpose only of holding the title to such real estate as may be prescribed by law for church edifices, parsonages and cemeteries."

This is not inhibitory of the existence of religious corporations in the state, nor is it a denial of their right to hold real estate. It simply limits their creation to "a general law," conformably with an-

other specific provision of the constitution prohibiting special legislation, and restricts such corporations to the purpose of holding title to real estate for church edifices, parsonages, and cemeteries. Its purpose was and is to prevent the incorporation of such bodies for the purpose of acquiring real estate for other purpose or use than the reasonable requirements for the prescribed purposes. The fact that the legislature of the state has not prescribed the maximum limit of the quantity of real estate to be held by such corporations gives no color to the contention that the state has refused to recognize the right of foreign religious corporations to hold property or transact business within the limits of the state. Cowell v. Springs Co., 100 U. S. 59, 60; Stevens v. Pratt, 101 Ill. 206; Thompson v. Waters, 25 Mich. 224; Merrick v. Van Santvoord, 34 N. Y. 221. But the state statute (article 10, Rev. St. 1889) authorizes the incorporation of such religious bodies or associations, and in a spirit of marked public liberality section 2825 provides that:

"Any association, congregation, society or church organization formed for religious purposes, and any association formed to provide or maintain a cemetery, * * * and in general any association, society. company or organization which tends to the public advantage in relation to any or several of the objects above enumerated, and whatever is incident to such objects, may be created a body corporate and politic by complying with sections 2821 and 2822."

Section 2828 declares:

"Corporations may be formed, under the provisions of this article, to execute any trust, the purpose whereof is within the purview of this article, and may receive and take, by deed or devise, in their corporate capacity, any property real and personal, for the use and purposes of such trust, and execute the trust so created."

Section 2833 provides that:

"Any corporation, the purposes whereof are included in section 2825 hereof, may acquire and hold in its own name such real estate and buildings as may be necessary for assembly, library, laboratory and other rooms requisite for its purposes, and may receive income from such other rooms as may be requisite to the completeness of such buildings; but such income shall be applied to the purpose of such corporation as defined in section 2825."

And section 2835 makes specific provisions for a proceeding by quo warranto for inquiring into any misuser of the franchise of such corporation.

The property in question was originally acquired by an agent of this church, for the purpose of erecting thereon a temple, designed to be the New Jerusalem of this religious order, from which the eyes and yearning desires of this people, through 60 years of exile and wandering, have never been turned nor diverted. To them it has been as the New Jerusalem to the Israelite and as Mecca to the Moslem. For 62 years it has been known to this sect and the people of western Missouri as the "Temple Lot," on which, in the fullness of time and the fulfillment of prophecy, was to be erected a splendid temple for the gathering of the believers for religious worship and exaltation. Whether the 2½ acres contained in this lot be more than is necessary for the erection of such temple is a question the court would not undertake to determine in this collateral

proceeding. Such question belongs to the state. Lancaster v. Improvement Co., supra; Railroad Co. v. Lewis, 53 Iowa, 101–113, 4 N. W. 842; Bank v. Matthews, 98 U. S. 621; Chambers v. St. Louis, 29 Mo. 576; Land v. Coffman, 50 Mo. 252; Cowell v. Springs Co., 100 U. S. 56; Jones v. Habersham, 2 Sup. Ct. 336. "The acts of a foreign corporation which has not complied with the requirements of the constitution and laws of the state in relation to such corporations transacting business, owning and disposing of property, * * * are not void and unenforceable; and said foreign corporation can only in a direct proceeding by the state be prevented from exercising its franchise within the state until it has complied with the constitution and the laws." Wright v. Lee (S. D.) 51 N. W. 706. And in the same case (55 N. W. 931) the supreme court of Dakota hold that: "Although transacting business in this state by such noncomplying foreign corporation is a usurpation of power by such corporation, with the state rests the right to elect whether it will acquiesce in such usurpation, or dispute and prevent it."

3. Was this property, in its acquisition, impressed with a trust in favor of said church? As both parties claim under Edward Partridge, both are precluded from invoking any other source of title, and it is only necessary to inquire into the character of his tenure. Although the deed to Partridge did not, on its face, express any trust estate, the legal title may be impressed with a use for a third person by evidence aliunde. That he bought this property with funds contributed by the members of the church, and held the title in recognition of the trust, is too clear, to my mind, to admit of debate. In the first place, its acquisition by him was in fulfillment of the revealed will of God, as accepted by him, as a member of the church, in the Book of Doctrine and Covenants. He was a bishop of the central church, then at Kirtland, Ohio. As such he looked after its temporalities. After such a lapse of time it may be difficult to find this and that witness to testify to placing so much money in his hands. But the substantive facts appear in this case in persuasive clearness. The stress of this religious sect's environments rendered it expedient that they should seek asylum in the then remote west, where, as they supposed, unvexed by those who despitefully used them, they might tabernacle in peace. Witnesses testify to the fact of making contribution to this fund, and to the common notoriety of raising the money for this purpose. It was discussed in the public assemblies, and report was made to the church, showing that $3,000 had been raised for this purpose; and Bishop Partridge came to Independence, Mo., to acquire lands for the temple, and settlement of the people of his religion. From the day of the acquisition of this property by Partridge, he and his church, to the day of his death, in 1841, recognized this lot as church property. It was known as the "Temple Lot." Proof conclusive of this issue is furnished in the fact that Joseph Smith, the founder and head of the church, its recognized prophet and seer, himself came to Missouri, and in 1832 held religious services on this site, and solemnly dedicated it as the spot where the temple was to rise and shine. Partridge himself participated in this ceremony. And,

to "make assurance doubly sure," Partridge, on the eve of the expulsion of himself and the people of his church from the state by military force at the command of the governor, in 1839, made a deed, embracing this property, to the minor children of Oliver Cowdery, his co-worker in the church, and companion in misfortune, in which he recited the fact that "there was money put in my hands by Oliver Cowdery, an elder in the church of Latter-Day Saints, formerly of Kirtland, Ohio, for the purpose of entering the lands in the state of Missouri in the name and for the benefit of said church." This, no doubt, from the evidence, was the money placed in his hands and reported to the church at Kirtland, Ohio.

4. This deed from Partridge to the Cowdery children is assailed on various grounds. It is objected that there is not sufficient evidence of its delivery. The deed proper bears no date, but it was acknowledged on the 25th day of March, 1839. Presumptively it was executed prior thereto or contemporaneously therewith. Under the ruling of the state supreme court the presumption is that the deed was delivered the day of the acknowledgment. Fontaine v. Institute, 57 Mo. 552. It is also the settled rule of the state that the recording of a deed, duly acknowledged, is presumptive evidence of delivery. Kane v. McCown, 55 Mo. 198. There are also in this case other reasonable presumptions of delivery. The evidence shows that Partridge and his flock were, in 1839, in peril. They fled, under military menace, from Caldwell county, in this state. Filled with apprehension and uncertainty, and anxious for the execution of his sacred trust respecting this property, he fell upon the plan of declaring the trust in this deed, and of making the children of Oliver Cowdery, his tried friend, and an elder in the church, the depositaries of the title, believing no doubt that, on account of their tender years, they would be less exposed to violence and harm, and that, on account of their training in the church, they would be worthy and faithful trustees. It is therefore reasonable to conclude that he delivered the deed to some one of them, or to some one for them, before fleeing the state. It is quite inferable, from all the facts and circumstances in evidence, that these children died in their minority. Presumptions in equity should be more liberally indulged after such a long lapse of time, where the loss of witnesses by death and removals and disappearance often renders direct proof impossible. The recording act of the state statute during this period prescribed no time inter partes within which a deed should be admitted to record. The writer of this opinion sought unsuccessfully, as counsel in Sappington v. Oeschli, 49 Mo. 244, to have the court, on general principles of equity as to third parties giving credit to the ostensible owner of the fee on the faith thereof, hold that a deed should be recorded at least within a reasonable time. Even had there been no actual delivery of this deed, there is high authority, on sound principle, for holding that, where a trustee, in order to secure a trust obligation, makes a deed, even to himself as trustee, regularly executed, except recording it, and dies, leaving the deed among his papers, it will bind the land effectually as a declaration of trust, and it would be sufficiently delivered for such purpose. Carson v.

Phelps, 40 Md. 73. The state statute (section 4860) authorizes a copy of such recorded deed to be read in evidence, although not recorded within one year after execution, "upon proof of such facts and circumstances as, together with certificate of acknowledgment or proof, shall satisfy the court that the person who executed the instru-ment is the person therein named as grantor." Aside from the circumstances already recited, the evidence shows that the grantor lived in Caldwell county, Mo., where the acknowledgment purports to have been taken. He was a conspicuous character there, and naturally enough was known to the county judge, who himself was a member of the grantor's church. The law always presumes that a public officer does his duty. It is therefore to be presumed that the recorder of Jackson county, in admitting the deed to record, inspected it, and was satisfied of its original character. I therefore admit the deed in evidence.

5. This deed clearly enough declares a specific trust for the church. The criticisms made by counsel in this connection are strained. They do violence to the declared honest purpose of the grantor. It is contended, for instance, that the description of the land is uncertain. After other particularities, the deed concludes as follows:

"This sale is to embrace all lots of all sizes situated in Independence, and to embrace the lot known as the 'Temple Lot,' and all other lands of whatever description said Partridge, the first party, is entitled to in Jackson county, in the state of Missouri."

The temple lot was thus not only susceptible of ascertainment and identification, but the evidence shows it was as well known to the people of Independence as the public square.

It is next suggested that the grantor acknowledged in this deed the receipt of $1,000 from Oliver Cowdery as purchase money for the land, and that this discharged the land from the trust, as the church presumably received the benefit of the money, and it cannot both hold the money and the land. This, it seems to me, is a non sequitur. If Oliver Cowdery in fact saw fit to pay Partridge $1,000 to so convey the land in trust, how does that destroy the existence of the trust, even if it had been made to appear by the evidence (which it does not) that Partridge turned the money over to the church? But the deed, taken in its entirety, shows clearly enough that the meaning of this acknowledgment was not that the grantor was then receiving $1,000 from Cowdery, but it is to be read and understood in connection with the opening sentence of the instrument, which declares that said Cowdery, as elder of the church, had put money in the grantor's hands. Cowdery knew as well as any living man that the temple lot had been bought by Partridge for the church, and that Partridge had come to Missouri as the bishop and agent of the church to acquire lands for its benefit and use. The deed shows on its face that it was very inartificially drawn, but shows throughout the purpose of the grantor to secure this property to the church. It winds up with the significant sentence: "Said Partridge also agrees to amend this deed to said Oliver Cowdery at any time for the purposes aforesaid."

6. The respondents claim title—First, through a deed of conveyance from three out of five of the heirs of Edward Partridge; and, second, by adverse possession. As the basis of the record title they offered in evidence a certified copy from the recorder's office of Jackson county of what purports to be a deed from three of said heirs, of date May 5, 1848, to one James Poole. The first objection to this deed is that it was not acknowledged properly. The point of this objection is that the clerk of the circuit court certified the acknowledgment under his private seal, there being no seal of the court provided. By section 16, p. 221, tit. "Conveyances," Rev. St. 1845, in force when this acknowledgment was taken, it is provided that:

"Every instrument in writing whereby any real estate is conveyed, or may be effected in law or equity, shall be acknowledged or proved and certified in the manner hereinafter prescribed.

Section 19 prescribed that such certificate shall be—

"When granted by a court, under the seal of the court, when granted by the clerk of the court, under the hand of the clerk and seal of the court of which he is clerk; when granted by an officer who has a seal of office, under the hand and official seal of such officer, when granted by an officer who has no seal of office, under the hand of such officer."

We will not pursue this matter further than to say that it would seem the statute is quite explicit that, where the acknowledgment is taken by a clerk of court, it must be "under seal of the court of which he is clerk." The deed should not be admitted in evidence, because neither the original was offered in evidence, nor any affidavit or other proof of its loss, or that it was not in the defendants' possession. Crispen v. Hannavan, 72 Mo. 548.

A yet more fatal objection to this deed as a valid conveyance against the unrecorded deed from Partridge of 1839 is the fact that no evidence whatever was offered tending to show that Poole paid a valuable consideration for this deed, or that any subsequent purchaser paid any valuable consideration. To constitute an innocent purchaser in such case, it is not sufficient that it should appear that a deed was executed, but the proof must go further, and show affirmatively that a valuable consideration was paid, and that, too, before the prior deed was placed of record. The recital of the receipt of alleged purchase money in the deed is not sufficient proof of the payment of the purchase money as against third parties. Coal Co. v. Doran, 142 U. S. 417–437, 12 Sup. Ct. 239, and cases cited; Bishop v. Schneider, 46 Mo. 473; Sillyman v. King, 36 Iowa, 207–213.

7. The respondents next rely upon 10 years' adverse possession of this property. Conceding that the Poole deed, and others following thereon, constituted color of title, there must be joined with it adverse possession. Avery v. Adams, 69 Mo. 603. Such possession must not only be adverse, but it must be unbroken for a period of 10 consecutive years. Moore v. Harris, 91 Mo. 617, 4 S. W. 439; Olwine v. Holman, 23 Pa. St. 279; Malloy v. Bruden, 86 N. C. 251. The statute of this state (section 6768) is but expressive of the better common-law rule that a possession of a part of a tract of land under color of title, to extend to other lands not actually occupied, must

be in the name of the whole tract claimed, coupled with the exercise of usual acts of ownership over the whole tract claimed. The evidence in this case shows that about 1851 Woodson and Maxwell platted that portion of the 63-acre tract lying north of Walnut street, and containing about one-fourth of the whole tract, laying it out into streets and alleys and lots, which included the temple lot; and it may be conceded to respondents that a part of this 63 acres outside of the temple lot was fenced, and perhaps some of the lots sold; but it is not sufficient that a party under a colorable deed should occupy one lot, where a tract is divided up into lots with separate streets, and acquire title by limitation to a lot not connected, and not occupied, by merely claiming title thereto. The segregation of the land into parcels and distinct lots with dividing streets, broke the continuity of the tract of 63 acres, and necessitated some open, visible acts of ownership over each parcel. Leeper v. Baker, 68 Mo. 402. It is too clear for debate that this temple lot in controversy was never fenced nor occupied until these respondents entered in 1882, and began to put a wire fence around it. It is true there are some witnesses who testify to mere impressions about a fence being somewhere about this lot in 1847. If so, it was not put there by Poole, or anyone claiming under him. The statements of these witnesses are entirely too indefinite and conjectural to predicate an adverse holding thereon. It is not sufficient that improvements should be shown to have been on or about the lot. It must appear affirmatively that they were made "by a party claiming adversely," and it must be continuous for the 10 years. Doolittle v. Tice, 41 Barb. 181. The platting of the land into lots and streets was an act of ownership, but, as the streets lay outside of the temple lot, little importance can be attached to that, unless followed up with some visible acts of dominion over that lot. The mere payment of taxes by separate parties on separate lots, without more, did not amount to an adverse holding. Chapman v. Templeton, 53 Mo. 465; Raymond v. Morrison, 59 Iowa, 371, 13 N. W. 332; McDermott v. Hoffman, 70 Pa. St. 31. It does not appear that Maxwell, who bought from Poole in 1848, did any act of ownership on this property outside of the fact that he and Woodson, by some arrangement not disclosed in the evidence, laid off the tract of 63 acres into lots and streets about 1851. It next appears from a decree made in the circuit court of Jackson county in 1859 that Woodson claimed to have made a contract of purchase with Maxwell for that portion of the tract lying south of Walnut street, which did not embrace the temple lot. Maxwell died in 1856, so he could not have held possession for 10 years; and there is no evidence of any possessory act by his heirs, or any one else, under him. The suit of Woodson was against the heirs of Maxwell in a partition proceeding. And how the court got into the decree therein made in 1859 any part of the temple lot, against the express finding that Woodson had bought from Maxwell only the land south of the street running south of the temple lot, is inexplicable. That part of the decree was a mere brutum fulmen. Recitations made in the partition proceedings and deeds are not binding on strangers. Warren v.

Syme, 7 W. Va. 474. No deeds were made under this partition sale until 1867. During all this time there is nothing shown to satisfy the mind of the court of a single act of ownership over a foot of the temple lot. About the time of the making these deeds under the partition proceeding, one J. R. Hedrick began to buy up these lots in the interest of Granville Hedrick, president of the defendant church, in trust for said church, who, as it will appear hereafter, had notice of the trust on said temple lot, and did not take actual possession thereof until 12 years after the trust deed from Partridge was put upon record, and without taking any steps to remove said cloud on the title.

8. Even if the Poole deed were admitted in evidence, it would only affect three-fifths of the lot, and it is impossible to reasonably escape the conclusion that he and all the parties claiming under him had notice of the trust character of the temple lot. It is a wise rule, predicated of sound public policy, and nearly always promotive of the ends of justice, announced by the supreme court in Benoist v. Darby, 12 Mo. 206:

"Where particular knowledge of a fact is sought to be brought home to a party, evidence of the general reputation and belief of the existence of that fact among his neighbors is admissible to the jury as tending to show that he also had knowledge as well as they. It is next to impossibility in very many cases to fix a positive knowledge of a fact upon an individual, notwithstanding the interest he may have in being correctly informed, and doubtless is informed thereof; and we cannot see the injustice of permitting a party to raise a presumption of knowledge in such case by showing that the community are informed on the subject, and hence the party interested may also have similar knowledge."

Courts will take judicial notice of matters of public history. They will also admit, for the purpose of notice, a matter of local history on proof aliunde tending to show its truth. The appearance and location of the "Mormons," so called, at Independence, Mo., and the selection of the temple lot, was as notorious in western Missouri as the famous "Order No. XI." of the late Civil War. The local community was stirred to its depths with intensest excitement over the fact of the proposed erection on this site of the central temple of this sect as their New Jerusalem, and the gathering around it, on the contiguous 63 acres, of the believers. It led to open, armed hostilities between them and the gentiles. The testimony of quite a number of old residents, gentlemen of the highest character, as well as the testimony of many of respondents' witnesses, shows indisputably that this lot was generally known and recognized in that community as the "Temple Lot." Its public dedication as such by Joseph Smith, the founder, prophet, and seer of the church, was itself an event so noteworthy that it is incredible it should not have been known, and been long the subject of common talk in the community. Partridge was a conspicuous character in the church, and his children were followers. The name "Temple Lot" has adhered to this piece of property, on one of the principal thoroughfares of the city of Independence, through all these years. And the circumstances detailed by Emily, the daughter of Partridge, under which the deed was executed to Poole, carry persuasive evidence to my

mind that he knew he was after acquiring this property covertly, and that he was really acting in the matter in the interest of Max-well, to whom he at once conveyed. When Woodson and Maxwell, themselves old settlers, and conspicuous characters of the county, platted this ground, they designated the street bounding this lot on the east, "Temple Street." They must have known they were try-ing to reduce to speculative interest a spot sacred to this church. They assumed, doubtless, that those people, violently expelled from the state, and under popular odium, would not have the temerity to claim their own, and to carry out the purpose of the dedication of this lot. Granville Hedrick, the head and founder of the re-spondent organization, was himself, up to 1857, a conspicuous mem-ber and minister of the complainant organization. He knew all about the trust character of this property, and his purpose was, in buying up these supposed outstanding titles, to preserve the prop-erty to its trust use. So impregnated with this thought were his followers that the leader and the trustee for this property testified in this case as follows:

"Q. Is it true that you claim and hold, and have always so claimed and held since you have been the trustee, to hold the property in trust for the legal succession of the church that was organized in 1830? A. In no other way have we held it than for the church, and we claim to be the church, in legal succession, from 1830 down to the present. We are holding it in trust for the church which is represented by us, and which we claim is the church that was organized by Joseph Smith on the 6th day of April, 1830, as history records it. We claim to hold the property in that way, as being part and parcel of the church organized at that time."

The respondent Hill, who holds whatever title the respondents have to this property, testified that he came to Independence, Mo., in 1868, "not because of any special temporal benefit," but because "the saints were to gather here in Independence, or Zion, as it is called. I had read the revelation in the Book of Doctrine and Covenants in reference to the temple property here in Independence, begin-ning with July, 1831. * * * I did not have to try to find it [the lot], for it was here plain enough to be seen. I found the temple property myself, and it was known as the 'Temple Lot' when I came here." While it is true that a person purchasing land from one who appears by record deed to be the owner in fee is not bound by equities in favor of a stranger to the deed, yet, if he have notice of equities dehors the record, he is as effectually bound thereby as if such equities were incorporated in the deed. "The taking of a legal estate after notice of a prior writing makes a person a mala fides purchaser; * * * and actual notice embraces all degrees and grades of evidence, from the most direct and positive proof to the slightest circumstance from which a jury would be warranted in inferring notice." Coal Co. v. Doran, 142 U. S. 437, 438, 12 Sup. Ct. 239. There is perhaps not a Mormon on the American continent, possessed of any intelligence, who has not known, from his connection with the church, the history of the temple lot at Independence; and it would be about as reasonable to suppose that an Israelite could become the purchaser of a lot in Jerusalem, and claim that he was

an innocent purchaser against the design of his people to re-establish there the New Jerusalem, as to say these respondents are innocent purchasers.

9. It remains to be ascertained who are the true beneficiaries of this trust. It is a mere play on words, a clutching after shadows, for respondents to quibble about the precise name by which the Mormon Church was known in its early history. As well say that the denomination of Christians now known as "The Christian Church" had lost their identity, because in their early history they were called "Campbellites." The identity, unity, and sameness from 1830 to 1844 of the Mormon Church are too clear for debate. Now and then, by this and that person, it was called "The Church of Christ," "Church of Latter-Day Saints," and "The Church of Jesus Christ of Latter-Day Saints." The terms were employed interchangeably. As applied to this issue, it is rather a question of identity of doctrine. The temple built at Kirtland, Ohio, the central rendezvous between 1830 and 1835, was inscribed on the portal with the words, "The Church of Jesus Christ of Latter-Day Saints." This was the public authoritative recognition of the name by which they chose to be known. Beyond all cavil, if human testimony is to place any matter forever at rest, this church was one in doctrine, government, and purpose from 1830 to June, 1844, when Joseph Smith, its founder, was killed. It had the same federal head, governing bodies, and faith. During this period there was no schism, no secession, no "parting of the ways," in any matter fundamental or affecting its oneness. The only authorized and recognized books of doctrine and laws for the government of the church from 1830 to 1846 were the Bible, the Book of Mormon, and the Book of Doctrine and Covenants. The Book of Doctrine and Covenants, which consisted principally of claimed divine revelations to Joseph Smith, was the edition published at Kirtland, Ohio, in 1835, and at Nauvoo in 1845. No possible question could be made that, had this church, with its central governing power resident at Nauvoo, asserted right of control over this property up to 1845, it would have been recognized by the ecclesiastical body and by courts of chancery as the beneficiary of the trust recognized by Edward Partridge from 1832, and declared by him in his trust deed of 1839. Joseph Smith was killed at Carthage, Ill., in June, 1844. He was the president and the inspiring spirit of the church. His violent death struck with dismay the hearts of his followers, and out of the confusion incident thereto was born disorder, schism, and ambition for leadership. Disintegration set in, and the church split into factions, which, under the lead of different heads, scattered to different parts of the country. Among the "Quorum of Twelve"—representing the apostles—was one Brigham Young, a man of intellectual power, shrewd and aggressive, if not audacious. Naturally enough, such a man gathered around him the greater numbers, and it was an easy matter for him to seize the fallen reins of the presidency. He led the greater portion of Mormons out to what was known as "Winter Quarters," near Omaha, and thence to Salt Lake valley, in Utah, then a dependency of old Mexico.

From this settlement has sprung the powerful ecclesiastical body known as the Salt Lake or Utah Church. While the respondents are wary of claiming alliance with this Salt Lake Church, it is evidently "the power behind the throne" in the defense of this suit; and claim is made by respondents' counsel that it in fact absorbed the Mormon Church, and is the real successor to the ancient church. There can be no question of the fact that Brigham Young's assumed presidency was a bold and bald usurpation. The Book of Doctrine and Covenants (printed in 1846), page 411, containing a revelation to Joseph Smith, January 19, 1841, gave unto them "my servant Joseph, to be a presiding elder over all my church, to be a translator, a revelator, a seer, and prophet. I give unto him for councillors my servant Sidney Rigdon, and my servant William Law, that these may constitute a quorum and first presidency, to receive the oracles for the whole church. I give unto you my servant Brigham Young, to be a president over the twelve traveling council." So that Brigham Young was but president over the "twelve," a traveling council. The book clearly taught that the succession should descend lineally, and go to the first born. Joseph Smith, so taught, had, before his taking off, publicly proclaimed his son Joseph, the present head of complainant church, his successor, and he was so anointed. The book also contains the following, when referring to Joseph Smith:

"But verily I say unto you that none else shall be appointed unto the gift, except it be through him, for if it be taken from him he shall not have power, except to appoint another in his stead; and this shall be a law unto you: that you receive not the teachings of any that shall come before you as revelations or commandments; and this I give unto you that you may not be deceived, that you may know they are not of me. For verily I say unto you that he that is ordained of me shall come in at the gate, and be ordained, as I have told you before, to teach those revelations which you have received, and shall receive through him whom I have appointed."

Brigham Young's assumption of this office (under the claim of something like a transfiguration) was itself a departure from the law of the church. The Book of Mormon itself inveighed against the sin of polygamy. True it is that Brigham Young taught that these denunciations of the book were leveled at the Indians,—the Lamanites. But I confess to an utter inability to interpret human language if this be correct. In chapter 1, Book of Jacob, in speaking of the people of Nephi, the favored people, they are arraigned for growing hard of heart, and "indulge themselves somewhat in wicked practices, such as like unto David of old, desiring many wives and concubines; and also Solomon, his son." And in chapter 2, same book, after alluding to the filthiness—evidently of the Indian tribes —it says: "Behold, the Lamanites, your brethren, whom ye hate, because of their filthiness, and the cursings which have come upon their skins, are more righteous than you, for they have not forgotten the commandment of the Lord, which was given unto our fathers, that they should have save it were one wife; and concubines they should have none. * * * And now this commandment they observe to keep, wherefore because of this observance in keeping this commandment the Lord God will not destroy them; and one day

they shall become a blessed people." How it can be that the Laman-
ites please God in sticking to one wife, and the Nephites displeased
Him by imitating David and Solomon in multiplying wives, and yet
polygamy is to be a crown of righteousness in the teachings of the
Angel Mormon, challenges my power of comprehension. It requires
transfiguration to do, so. Conformably to the Book of Mormon, the
Book of Doctrine and Covenants expressly declared "that we believe
that one man should have but one wife, and one woman but one hus-'
band." And this declaration of the church on this subject reap-
peared in the Book of D. and C. edition of 1846 and 1856. Its first
appearance as a dogma of the church was in the Utah Church in
1852. Claim is made by the Utah Church that this doctrine is predi-
cated of a revelation made to Joseph Smith in July, 1843. No such
revelation was ever made public during the life of Joseph Smith, and
under the law of the church it could not become an article of faith
and belief until submitted to and adopted by the church. This was
never done. No more complete and caustic refutation of this claim,
made by Brigham Young, can be found than that in Exhibit W
in this case, in a book entitled "The Spiritual Wife System Proven
False," issued by Granville Hedrick, the head of the respondent
church, in 1856. He ridiculed the pretension of Brigham Young
that he had this revelation, unproclaimed, locked up in his private
chest for nine years: He says:

"Now, how strangely inconsistent that the revelation should be given nine
or ten years before its time, and have to lie eight or nine years under his
patent lock before it would be time to proclaim it. Here, then, we have a
specimen of an abortive revelation, come before its time, and had to be put
in the sacred desk, under a patent lock, for eight or nine years, and shown oc-
casionally,—just often enough to get the thing used to it, so that when it
got old enough it could go abroad. So much for this curious revelation, come
in an abortion, got burned up, then locked up, and now has gone forth to damn
everybody that don't believe in it. Why, it is a perfect phoenix."

When the present president of the Salt Lake Church, Wilford
Woodruff, was on the witness stand, he testified that on the 15th
of November, 1844, there was no marriage ceremony in the church
except that published in the edition of 1835. He was then asked
why the church, of which he is president, in the publication of the
Book of Doctrine and Covenants in the Salt Lake edition of 1876
eliminated the section on marriage as found in the 1835 edition,
and in all editions thereof published up to 1876, and inserted in
lieu thereof the claimed revelation on polygamy of July, 1843. "An-
swer: I do not know why it was done. It was done by the author-
ity of whoever presided over the church, I suppose. Brigham
Young was the president then." The Utah Church further departed
from the principles and doctrines of the original church by changing
in their teaching the first statement in the Article of Faith, which
was, "We believe in God, the Eternal Father, and in his Son, Jesus
Christ, and in the Holy Ghost," and in lieu thereof taught the doc-
trine of "Adam—God Worship," which, as announced in Journal of
Discourses by Brigham Young, is as follows: "When our Father,
Adam, came into the garden of Eden, he came into it with a celes-
tial body, and brought Eve, one of his wives, with him. He helped

to make and organize this world. He is Michael, the archangel, the Ancient of Days, about whom holy men have written and spoke. He is our Father and our God, and the only God with whom we have to do." It has introduced societies of a secret order, and established secret oaths and covenants, contrary to the book and teachings of the old church. It has changed the duties of the president and of the twelve, and established the doctrine to "Obey Counsel," and has changed the order of the "Seventy, or Evangelists."

10. The next important and interesting question is, does the complainant church represent the beneficiaries of this property? In controversies of this character, respecting the rightful ownership of church property, the civil judicatories have nothing to do with the question as to which faction expounds the sounder theology or moral philosophy, and which best accords with reason and common sense. A good chancellor may be an indifferent theologian, and when he should lay aside the ermine for the surplice he might prove more bigot than justiciary. As said in Smith v. Pedigo (Ind. Sup.) 33 N. E. 777:

"Religious doctrines and practices are listened to by the courts solely as facts upon which civil rights and the right to property are made to depend, regardless of the ultimate truth or soundness of such doctrines, practices, and beliefs."

In case of disorganization and factional divisions of an ecclesiastical body, the settled rule of the civil courts is that "the title to church property * * * is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws and usages, customs and principles, which were accepted among them before the dispute began, and the standards for determining which party is right." The right of ownership abides with that faction, great or small, which is "in favor of the government of the church in operation with which it was connected at the time the trust was declared." McRoberts v. Moudy, 19 Mo. App. 26; Roshi's Appeal, 69 Pa. St. 462; Baker v. Fales, 16 Mass. 488; White Lick Quarterly Meeting of Friends v. White Lick Quarterly Meeting of Friends, 89 Ind. 136. The courts will adjudge the property "to the members, however few in numbers they may be," who adhere to the form of church government, or acknowledge the church connection, for which the property was acquired. Judge Strong's lecture on Relation of Civil Law to Church Property, pp. 49–59. Justice Caton, in Ferraria v. Vasconcellos, 31 Ill. 54, 55, aptly states the rule to be:

"That, where a church is erected for the use of a particular denomination or religious persuasion, a majority of the members cannot abandon the tenets and doctrines of the denomination, and retain the right to the use of the property; but such secessionists forfeit all right to the property, even if but a single member adheres to the original faith and doctrine of the church. This rule is founded in reason and justice. * * * Those who adhere to the original tenets and doctrines for the promulgation of which a church has been erected are the sole beneficiaries designed by the donors, and those who depart from and abandon those tenets and doctrines cease to be beneficiaries, and forfeit all claim to the title and use of such property."

No matter, therefore, if the church at Nauvoo became a prey to schisms after the death of Joseph Smith, and presented as many

frightful heads as did the dragon which the Apostle John saw in his vision on the Isle of Patmos, if there was one righteous left in Sodom, the promise of the covenant and of the law of the land is to him. It is neither good law nor Bible history to say that, because the saints became scattered, and without an organism, the faithful lost the benefit of the church property. Forsooth the children of Israel were carried captive to Babylon, "the mother of harlots, and the abomination of the earth," they did not cease to be children of the covenant, nor lose their interest in Jerusalem. A considerable number of the officers and members of the church at Nauvoo did not ally themselves with any of the factions, and wherever they were they held on to the faith, refused to follow Brigham Young to Utah, and ever repudiated the doctrine of polygamy, which was the great rock of offense on which the church split after the death of Joseph Smith. In 1852 the scattered fragments of the church, the remnants of those who held to the fortunes of the present Joseph Smith, son of the so-called "martyr," gathered together sufficiently for a nucleus of organization. They took the name of "The Reorganized Church of Jesus Christ of Latter-Day Saints," and avowed their allegiance to the teachings of the ancient church; and their epitome of faith adopted, while containing differences in phraseology, in its essentials is but a reproduction of that of the church as it existed from 1830 to 1844. To-day they are 25,000 strong.

It is charged by the respondents, as an echo of the Utah Church, that Joseph Smith, "the martyr," secretly taught and practiced polygamy; and the Utah contingent furnishes the evidence, and two of the women, to prove this fact. It perhaps would be uncharitable to say of these women that they have borne false testimony as to their connection with Joseph Smith, but, in view of all the evidence and circumstances surrounding the alleged intercourse, it is difficult to escape the conclusion that at most they were but sports in "nest hiding." In view of the contention of the Salt Lake party that polygamy obtained at Nauvoo as early as 1841, it must be a little embarrassing to President Woodruff of that organization, when he is confronted, as he was in the evidence in this case, with a published card in the church organ at Nauvoo in October, 1842, certifying that he knew of no other rule or system of marriage than the one published in the Book of Doctrine and Covenants, and that the "secret wife system," charged against the church, was a creature of invention by one Dr. Bennett, and that they knew of no such society. That certificate was signed by the leading members of the church, including John Taylor, the former president of the Utah Church. And a similar certificate was published by the Ladies' Relief Society of the same place, signed by Emma Smith, the wife of Joseph Smith, and Phoebe Woodruff, wife of the present President Woodruff. No such marriage ever occurred under the rules of the church, and no offspring came from the imputed illicit intercourse, although Joseph Smith was in the full vigor of young manhood, and his wife, Emma, was giving birth to healthy children in regular order, and was enceinte at the time of Joseph Smith's

death. But if it were conceded that Joseph Smith, and Hiram, his brother, did secretly practice concubinage, is the church to be charged with those liaisons, and the doctrine of polygamy to be predicated thereon of the church? If so, I suspect the doctrine of polygamy might be imputed to many of the gentile churches. Certainly it was never promulgated, taught, nor recognized as a doctrine of the church prior to the assumption of Brigham Young.

It is next charged against complainant church that it has added to the articles of faith other revelations of the divine will, alleged to have been made to Joseph Smith, the present head of complainant church. If so, how can this be held to be heretical, or a departure, when, in the epitome of faith of the ancient church, is this article: "We believe all that God has revealed, all that He does now reveal, and we believe that He will yet reveal many great and important things pertaining to the kingdom of God." And in the Book of Doctrine and Covenants (paragraph 2, § 14) it is taught that such revelations might come through him whom the prophet might ordain. In the very nature of the doctrine of the church, that God, in the fullness of time, makes known his will to the church by revelation, additional revelations were to be expected. No specification is made by learned counsel as to wherein the alleged new revelations declare any doctrine at variance with that taught in antecedent revelations.

It is next charged that the complainants have a new Bible. The basis for this is that Joseph Smith, the founder of the church, was, as early as 1830, engaged in a translation of the Bible, which he is alleged to have completed about 1833 or 1834. This work seems to have been recognized also in a revelation in section 13, paragraph 15, and in section 58. The evidence shows that this manuscript was kept by his wife, and delivered to the present Joseph Smith, her son, and was published by a committee of the church. It is not claimed by Joseph Smith that this translation is a substitute for the King James translation, nor has it been made to appear that it inculcates any new religious tenet different from that of the ancient church. In this day of multifarious and free translations of the Bible, it should hardly be imputed a heresy in this church to take some liberties with the virgin Greek and Hebrew. It is also charged that the complainant church has only eleven representing the Quorum of Twelve. I believe the New Testament records it as a historical fact that "Peter stood up with the eleven" after the apostacy of Judas Iscariot. There is nothing in the Code of the present church to prevent the filling out of the "twelve." There are some other minor objections to the present organization, the answer to which is so obvious that it scarcely need be made.

11. Who are the respondents, and in what do they believe? Looking at their answer in this case, and their evidence, the idea occurs that in theory they are ecclesiastical nondescripts, and in practice "squatter sovereigns." They repudiate polygamy while looking to Salt Lake City for succor. They deny in their answer that this property was ever bought for the church, or impressed with a trust therefor, and yet, when their head men were on the witness stand,

they swore they are a part and parcel of the original church, founded and inspired by Joseph Smith, "the martyr," and that to-day they hold the property in question in trust for that church. They are commonly called "Hedrickites," because their head is Granville Hedrick, who himself was a member of complainant organization as minister, and participated actively in its general conference as late as 1857, receiving "the right hand of fellowship," and moving the conference to works of evangelization in his region of the country. It is inferable from the testimony in this case that they reject measurably the standard Book of Doctrine and Covenants, and, according to the testimony of respondent Hill, they "repudiate the doctrine taught by the church in general after 1833, 1834, and 1835;" and also the law relating to "Tithes and Offerings," and the doctrine of baptism for the dead, which were taught by the mother church. They also seem to reject the law relating to the presidency, and of "the Twelve—Traveling High Council," and also "the Quorum of Seventy Evangelists." They are but a small band, and their seizure of the temple lot, and attempt thus to divert the trust, invoke the interposition of a court of equity to establish the trust, and prevent its perversion.

12. Laches. It is urged by respondents that the claim of complainant is stale, and that a court of equity will not afford relief where the party complaining has been guilty of laches. There are several answers to this objection. In the first place, this is an express trust in favor of complainant, arising on the Partridge deed of 1839. The statute of limitation does not run against an express trust. There was no repudiation of the trust by the trustees. Laches is a question determined by the circumstances of the particular case. The delay in bringing this action is not inexcusable. The beneficiaries of the trust were driven from the state in 1838–39 by military force, and were not permitted to return to the state. A public hostile feeling and sentiment were excited against them, which would have blazed up from the slumbering fires at any time thereafter prior to the Civil War, had they returned here, and attempted to occupy this property. No one better knew this than the respondents when they laid hands to this property. The complainants were not here "to stand by" while parties were giving and receiving deeds to this property. No improvements were made on, and no visible possession taken of, the temple lot, until 1882, within 10 years of the institution of this suit, and when the trust deed had been of record 12 years. Up to this hostile action of respondents the complainants had a right to assume that the trust character of this property was intact, and that the lot was open for their entry at any time when the auspicious hour came to build on it. In the language of Chief Justice Fuller in Coal Co. v. Doran, 142 U. S. 444, 12 Sup. Ct. 239: "There was no delay, therefore, in the assertion of its rights after they were invaded." See, also, Burke v. Backus (Minn.) 53 N. W. 458.

13. A court of equity has jurisdiction in this case. It belongs to it to remove clouds from title, "the relief being granted on the principle of quia timet." It is peculiarly its province, in a case like

this, to vindicate the trust, to determine the real beneficiaries of the trust estate, and to prevent its diversion.

Decree will go in favor of complainant, establishing the trust in its favor against respondents, removing the cloud from the title, enjoining respondents from asserting title to the property, and awarding the possession to the complainant.